# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| IN RE HOMEBANC CORPORATION SECURITIES LITIGATION | ) ) ) ) ) |

**CIVIL ACTION FILE
No. 1:08-CV-1461-TCB**

# LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

I.    Preliminary Statement .........................................................1

II.   Argument ..........................................................................2

   A.  Legal Standards ...............................................................2

   B.  Plaintiff Has Adequately Pleaded the Falsity of Defendants' Material
       Misstatements and Omissions ...........................................5

   C.  The Safe Harbor Does Not Apply ......................................10

   D.  Defendants Have Failed to Demonstrate That Their Actionable
       Misstatements Are Mere Puffery ......................................16

   E.  Plaintiff's Allegations Support a Strong Inference of Scienter ....................17

      1.  The Legal Standard for Scienter .................................17

      2.  The Complaint Adequately Alleges Defendants Had Actual
          Knowledge or Were Severely Reckless .......................20

      3.  The Confidential Witness Statements Support a Strong Inference of
          Scienter .................................................................26

      4.  The Complaint Adequately Alleges That Defendants Had Motive to
          Commit Securities Fraud ..........................................30

      5.  Absence of Stock Sales Does Not Negate Scienter ..................32

      6.  Disclosures of Boilerplate Risks Do Not Negate an Inference of
          Scienter .................................................................34

   F.  Plaintiff Has Adequately Pled Loss Causation ........................35

      1.  Legal Standards For Pleading Loss Causation ........................35

      2.  Price Declines During The Class Period Do Not Negate Loss
          Causation ...............................................................37

3.    Arguments Regarding External Economic Conditions May Not Be Properly Considered To Defeat Loss Causation ........................................39

G.   Plaintiff's Control Person Claims Are Adequate ..........................................50

III.    CONCLUSION..............................................................................................50

# TABLE OF AUTHORITIES

## Cases

*In re 2007 Novastar Fin., Inc.*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ........................................................................ 42

*In re 21st Century Holding Co. Sec. Litig.*, 2008 U.S. Dist. LEXIS 108196 (S.D. Fla. Nov 7, 2008) .................................................................................................. 45

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) ............................... 23, 33

*In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000) ............................................................................................................................ 30

*In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2001 U.S. Dist. LEXIS 3182 (S.D.N.Y. Mar. 23, 2001) .......................................................................... 7

*Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363 (M.D. Fla. 1999) ....... 4

*Ashcroft v. Iqbal,* No. 07-1015, __ U.S. __, 129 S. Ct. 1937 (2009) ........................ 3

*Basic Inc., v. Levinson*, 485 U.S. 224 (1988) ...................................................... 7, 35

*Beck v. Deloitte & Touche*, 144 F.3d 732 (11th Cir. 1998) ..................................... 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (U.S. 2007) ............................................ 3

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ...................... 28

*Bozeman v. Lucent Techs., Inc.*, 378 F. Supp. 2d 1348 (M.D. Ala. 2005) ............... 4

*Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368 (M.D. Ga. 2000) ................. 18

*In re Catalina Mktg. Corp. Secs. Litig.*, 390 F. Supp. 2d 1110 (M.D. Fla. 2005) ..... 4

*In re Centocor, Inc. Sec. Litig. III,* No. 98-260, 1998 U.S. Dist. LEXIS 18909 (E.D. Pa. Dec. 1, 1998) .................................................................................... 30

*City of Brockton Ret. Sys. v. Shaw Group. Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..... 18

*City of Sterling Heights Police & Fire Retir. Sys. v. Abbey Nat'l., PLC.*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006) ...................................................................... 12, 49

iv

*Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007) ....................................................................................3, 43, 44

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001)...............31

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................................9, 29, 42, 49

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ............................38

*Demarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004)........38

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978).......................................................25

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ........... 35, 36, 37, 38, 43, 44, 45

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d 1221 (M.D. Fla. 2008) ...................................................................13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .................................................................... 36, 46

*Freeland v. Iridium World Commc'nc, Ltd.*, 233 F.R.D. 40 (D.D.C. 2006) ...........43

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2nd Cir. 2000) ....................................7

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) ...................... 5, 20

*In re Globalstar Sec. Litig.*, No. 01-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ...................................................................................12

*Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363 (M.D. Fla. 2008).................19

*Gross v. Medaphis Corp.*, 977 F. Supp. 1463 (N.D. Ga. 1997) ..............................30

*Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212 (S.D.N.Y. 2008) ...................................................................................25

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999)..............................................10

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260 (N.D. Ala. 2009) ........... 38, 39

*Higginbotham v. Baxter Int'l, Inc.*, 544 F.3d 753 (7th Cir. 2007).................... 29, 30

*In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006) .........................30

*Institutional Investors Group v. Avaya, Inc*., 564 F.3d 242 (3d Cir. N.J. 2009) .....29

*In re Interlink Electronics, Inc*., No. 05-cv-08133, 2008 U.S. Dist. LEXIS 84463
   (C.D. Cal. Oct. 6, 2008)........................................................................................45

*La Grasta v. First Union Securities, Inc.*, 358 F.3d 851 (11th Cir.
   2004) ...........................................................................................11, 12, 33, 34

*In re Lattice Semiconductor Corp. Sec. Litig*., 2006 U.S. Dist. LEXIS 262 (D. Or.
   Jan. 3, 2006)........................................................................................................31

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008).............. 33, 40

*Lentell v. Merrill Lynch & Co.,* 396 F. 3d 161 (2d Cir. 2005) ................... 35, 44, 45

*Leykin v. AT&T Corp.,* 423 F. Supp 2d 229 (S.D.N.Y. 2006)................................42

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. Ill.
   2008) ..............................................................................................................29, 31

*McDonald v. Allen Bush Brokerage Co.*, 863 F.2d 809 (11th Cir. 1989) ........ 19, 20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049 (9th Cir.
   2008) ....................................................................................................................45

*In re MicroStrategy, Inc. Sec. Litig*., 115 F. Supp. 2d 620 (E.D. Va. 2000) ...........32

*Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003) ...................... 13, 51

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2007)............ 26, 27, 29, 33

*In re MoneyGram Int'l, Inc. Sec. Litig*., 626 F. Supp. 2d 947 (D. Minn. 2009) ........... 9, 18

*Montoya v. Mamma.Com, Inc*., No. 05-cv-2313, 2006 U.S. Dist. LEXIS 13207
   (S.D.N.Y. Mar. 28, 2006).....................................................................................38

*In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007) .............................43

*In re Netbank, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 69030 (N.D. Ga. Jan. 29, 2009) ................................................................... 8, 10, 11, 20, 24, 33, 36, 40, 41

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)........................................................33

*In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338 (N.D. Cal. 2000) ...............33

*P.R. Diamonds Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004)..............................33

*In re PainCare Holdings Secs. Litig.*, 541 F. Supp. 2d 1283 (M.D. Fla. 2007)......50

*Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004)........................19

*Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) .......................................33

*In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996)......................12

*In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla 2002) .....36

*Ramp Networks Inc. Sec. Litig.*, 201 F. Supp. 2d 1051 (N.D. Cal. 2002) ...............33

*In re Ravisent Techs.*, No. 00-1014, 2004 U.S. Dist. LEXIS 13255 (E.D. Pa. July 12, 2004) ...............................................................................33

*Rosen v. Textron*, 321 F. Supp. 2d 308 (D.R.I. 2004) ............................................16

*Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219 (S.D. Fla. 2007) ...................... 10, 13

*In re Sci. Atlanta,* 239 F. Supp. 2d 1351 (N.D. Ga. 2002) ............................... 17, 39

*SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007)................. 14, 15, 16

*In re Sensormatic Elec. Corp. Sec. Litig.*, No. 01-8346-CIV-HURLEY, 2002 WL 1352427 (S.D. Fla. Jun. 10, 2002).........................................................26

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009) ...........................3, 8

*South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008) .....................................19

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S. Ct. 761 (2008)................................................................................. 4, 35

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F. 3d 87 (2d Cir. 2001) ................................................................................... 46, 47

*In re Teca Energy, Inc. Sec. Litig,*. 2006 U.S Dist. LEXIS 73833 (M.D. Fla. Oct 10, 2006) ..........................................................................45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)....................................................... 3, 17, 18, 19, 23, 25, 30, 33

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) ................................30

*In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308 (N.D. Ga. 2001)...... 14, 15, 16

*Tripp v. IndyMac Bancorp, Inc.*, No. CV 07-1635, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ..........................................................................25

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976).........................................................................7

*In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353 (S.D. Fla. 2001)...... 10, 20

*In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009).............11

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003)...16, 32, 40

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-01265, 2008 U.S. Dist. LEXIS 47748 (D. Colo. Mar. 28, 2008)...............................................33

*In re Williams Secs. Litig.*, 339 F. Supp. 2d 1206 (N.D. Okla. 2003) ....................32

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001).................................5

## Statutes

15 U.S.C. § 78u-4(b)(2) ..........................................................................17

15 U.S.C. § 78u-5(c)(1)(A).......................................................................10

## Rules

Fed. R. Civ. P. 8(a)..................................................................................4

Fed. R. Civ. P. 8(a)(2) ...............................................................................35

Fed. R. Civ. P. 9(b) ....................................................................................4

Fed. R. Civ. P. 12(b)(6) ..............................................................................1

Fed. R. Civ. P. 15 .......................................................................................6

## I.    Preliminary Statement

Faced with the Consolidated Amended Complaint's (the "Complaint") pointed and detailed allegations of securities fraud, Defendants improperly reach well beyond the four corners of the pleading to the financial crisis that hit this country more than a year after the end of the Class Period, in an attempt to portray themselves as mere victims of circumstance and to deflect focus from their specifically alleged intentional or severely reckless misrepresentations and omissions of material fact regarding HomeBanc Corporation ("HomeBanc" or the "Company"), its financial condition, operations, results, and business from September 26, 2005 to August 3, 2007.  Def. Br. at 2. This "factual" defense has no place on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and must be ignored. Stripped of that inappropriate distraction, and in light of the applicable standards for determination of a motion to dismiss under the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Defendants' motion offers no cognizable basis for the Court to dismiss the Complaint.

Like many mortgage firms, HomeBanc faced slowing loan originations and certain macroeconomic conditions during the Class Period. However, rather than disclosing these facts as required by the securities laws, Defendants, unbeknownst to the investing public, engaged in a new, reckless, and fundamentally different

business strategy to generate the appearance of continued financial health by dramatically loosening or ignoring underwriting standards and the Company's own policies to increase loan production—locking in loan commitments at a loss to the Company—and purchasing high-risk mortgage-backed securities to generate short-term revenue at the expense of long-term safety. Defendants embarked upon this undisclosed reckless conduct while simultaneously reassuring investors that the Company's financial condition, loan origination pace, risk management practices, internal controls, disclosure controls, and liquidity position were the product of careful and conservative management practices and policies that set HomeBanc apart from other companies suffering problems in the industry when, in truth, the Company was on the brink of collapse. While Defendants would have the Court believe that such misconduct was "typical of its peers in the industry," Def. Br. at 2, this is neither true nor a defense against the claims alleged.

Thus, as demonstrated below, the Complaint adequately alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.    Argument

### A.    Legal Standards

In considering a "motion to dismiss for failure to state a claim, the court construes the complaint in the light most favorable to the plaintiff and accepts all

well-pled facts alleged by in [sic] the complaint as true." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "[f]actual allegations in a complaint need not be detailed but 'must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id.* at 1252 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (U.S. 2007)). "In seeking dismissal for failure to state a viable claim, a defendant thus bears the 'very high burden' of *showing* that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735-736 (11th Cir. 1998) (emphasis added) (internal citation omitted). Thus, a complaint need only allege "enough factual matter (*taken as true*)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp.,* 550 U.S. at 556 (emphasis added; citation omitted).  As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* No. 07-1015, __ U.S. __, 129 S. Ct. 1937, 1940-41 (2009).

Further, the Court must limit itself to facts stated in the Complaint, documents attached to the Complaint as exhibits, and documents incorporated by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Even those narrow categories of documents extraneous to a complaint and appropriate for consideration may only be considered for the fact that they say what they say – not for the truth of the statements made therein. *See Bozeman v. Lucent Techs., Inc.*, 378 F. Supp. 2d 1348, 1351 (M.D. Ala. 2005).

In order to state a claim under Section 10(b) of the Exchange Act, Plaintiff must allege: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S. Ct. 761, 768 (2008).

In addition to the notice pleading requirements of Fed. R. Civ. P. 8(a), which are applicable to Plaintiff's allegations, the Court must find that the Complaint satisfies the particularity pleading requirements of Fed. R. Civ. P. 9(b) with respect to the alleged misrepresentations and omissions and the heightened *scienter* pleading requirement of the PSLRA. *In re Catalina Mktg. Corp. Secs. Litig.*, 390 F. Supp. 2d 1110, 1113–14 (M.D. Fla. 2005).

To satisfy Rule 9(b)'s particularity requirement for pleading fraud, a securities fraud complaint "need only provide a reasonable delineation of the underlying acts and transactions constituting the fraud." *Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363, 1369-70 (M.D. Fla. 1999). "This means the who, what, when[,] where, and how: the first paragraph of any newspaper story."

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006); *accord Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). Plaintiff has surpassed that requirement here. *See, e.g.*, ¶¶50, 52, 54, 56, 65, 74, 84, 96, 97, 99, 108, 119, 122, 126, 136, 146 (the "who"); ¶¶50, 52, 54, 56, 57, 59, 61, 63, 66, 68, 70, 74, 76, 78, 80, 82, 86, 88, 90, 92, 96, 97, 100, 102, 104, 106, 108, 110, 112, 114, 116, 119, 122, 123, 126, 128, 130, 132, 134, 136, 138, 140, 142, 144, 147, 148 (the "what"); ¶¶50, 52, 54, 56, 65, 74, 84, 95, 99, 108, 118, 121, 126, 136, 146 (the "when"); ¶¶50, 52, 54, 56, 65, 74, 84, 95, 99, 108, 118, 121, 126, 136, 146 (the "where"); ¶¶51, 53, 55, 58, 60, 62, 64, 67, 69, 71, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 98, 101, 103, 105, 107, 109, 111, 113, 117, 120, 124, 127, 129, 131, 133, 135, 137, 139, 141, 143, 145, 149 (the "how").

### B.    Plaintiff Has Adequately Pleaded the Falsity of Defendants' Material Misstatements and Omissions

Despite the Complaint's well-pleaded allegations of the specific materially false and misleading statements and/or omissions issued during the Class Period by Defendants, Defendants only challenge Plaintiff's allegations regarding the falsity of three categories of statements: statements on the adequacy of HomeBanc's reserves; statements regarding HomeBanc's sale of mortgage-backed securities; and statements attesting to HomeBanc's adherence to its underwriting standards. Def. Br. at 43. As to all other categories of alleged misrepresentations—including

those regarding the Company's pace and quality of loan originations and supposed focus on purchase money mortgages (¶¶59, 66, 86, 102, 110, 138); risk management practices (¶¶68, 78, 88, 97, 112, 130, 140); internal and disclosure controls (¶¶63, 70, 82, 92, 106, 116, 134, 144, 146-48); ability to meet liquidity requirements (¶¶61, 80, 90, 104, 114, 122, 132, 142); and the Company's financial condition (¶¶96, 119, 122, 130)—Defendants have effectively conceded that Plaintiff has adequately pleaded the falsity of those misstatements and omissions for the purposes of overcoming this motion to dismiss. For the remaining three categories of misstatements and omissions that Defendants dispute, as demonstrated below, except for the adequacy of HomeBanc's reserves,[1] the Complaint adequately pleads the material falsity of Defendants' statements throughout the Class Period.

The test for a materially false or misleading statement is well established. "To fulfill the materiality requirement 'there must be a substantial likelihood that

---

[1] With regard to HomeBanc's reserves, the Complaint inadvertently alleges matters concerning HomeBanc's deficient loss reserve model as relating to the Company's contingent reserve rather than as intended the Company's allowance for loan losses. *See* ¶¶57, 76, 84, 100, 108, 128, 136. Plaintiff therefore withdraws those allegations to the extent they reference the contingent reserve. Plaintiff's counsel discussed this mistake with defense counsel and requested Defendants stipulate to permit Plaintiff to amend the Complaint to avoid, *inter alia*, the need for the Court to address arguments involving this curable mistake. Defense counsel rejected that suggestion. Therefore, Plaintiff intends to file a motion for leave to amend pursuant to Fed. R. Civ. P. 15.

the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc., v. Levinson*, 485 U.S. 224 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)). Put another way, a "misrepresentation of fact is material . . . when an investor would attach importance to it in making an investment decision." *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2001 U.S. Dist. LEXIS 3182, at *10 (S.D.N.Y. Mar. 23, 2001). "Only if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout is it proper for the court to pronounce the omission immaterial as a matter of law." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-64 (2nd Cir. 2000).

The Complaint alleges that HomeBanc loosened (and, indeed, essentially abandoned) its underwriting standards and policies in response to slowing loan originations and thereby shifted from its publicly stated focus on careful, conservative risk management to attempting to make a fast buck selling off poor quality loans. *See* ¶¶26-28. In response, Defendants contend that HomeBanc followed its stated underwriting policy by catering to the demands of the secondary market, which dictated the Company's loosening standards. Def. Br. at 48.[2] This is

---

[2] Defendants' characterization of HomeBanc as having no underwriting standards other than the perceived acceptability of loans to the secondary market is in direct contradiction with the June 2005 report from AG Edwards cited in the Complaint,

nothing more than a factual dispute over the underlying merit of Plaintiff's claims and does not place in issue whether the Complaint's allegations, if true, provide a sufficient predicate for a violation of Section 10(b) of the Exchange Act.

Here, Plaintiff has affirmatively alleged, in great detail, the who, what, when, where, how, and why with respect to HomeBanc's undisclosed loosening of its previously-touted conservative underwriting standards in response to slowing loan originations. ¶¶26-28, 51. As indicated by CW2, "the Company began 'loosening underwriting standards *in order to maintain production levels* as early as late 2005.'" ¶28 (emphasis added); Def. Br. at 47. This loosening of underwriting standards occurred because, as CW1 explained, "*as originations began slowing*," there was "intent to generate a lot more volume. As a result, there was an intent to increase the proportion of Alt-A [alternative documentation] loans as part of our portfolio." ¶26 (emphasis added); Def. Br. at 47. Thus, Defendants' unsubstantiated contention—that any loosening of HomeBanc's underwriting standards was dictated by the secondary market—is not only improper to inject here, but also is directly contradicted by the Complaint's allegations and, therefore, should be rejected. *See Sinaltrainal*, 578 F.3d at 1260; *In re Netbank, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 69030 at *19 (N.D. Ga. Jan. 29, 2009) (rejecting

---

which noted that HomeBanc "relies on strict underwriting standards that it has devised from analyzing proprietary historical performance data on interest-only ARM loans that it has originated over the past eight years." ¶29.

Defendants' argument "that the allegations in the Amended Complaint cannot possibly be true and therefore the claims should be dismissed.").

Similarly, the Complaint pleads that Defendants made actionable misstatements regarding the Company's business model, focus on high quality prime residential mortgage loans, and growth in loan originations by, among other things, failing "to disclose that HomeBanc began purchasing mortgage backed securities in 2005 *to compensate for slowing originations* of the Company's high quality prime residential mortgage loans." ¶¶51, 60 (emphasis added). In response, Defendants attempt to disclaim liability for their underlying misstatements by asserting the premature factual argument that HomeBanc disclosed to investors the possibility of purchasing mortgage-backed securities "from time-to-time in the future." Def. Br. at 46 (citing 2004 Form 10-K, filed 3/31/2005). However, this so-called "disclosure" fails utterly to provide notice that the Company embarked on a new, undisclosed strategy (*i.e.*, a material omission) of relying on such instruments to sustain revenues in 2005, and further that HomeBanc faced slowing originations of its high-quality prime purchase money mortgages. *See* ¶¶51, 60. *See also In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 978 (D. Minn. 2009) ("concealment of specific information related to the Portfolio's subprime exposure and contents" may mislead investor); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1146 (C.D. Cal. 2008) (misleading definition of subprime made

statements about "subprime" operations "inherently misleading to investors"). This dispute as to adequacy of disclosure should be reserved for the trier of fact. *See In re Netbank,* 2009 U.S. Dist. LEXIS 69030, at *19.

### C.    The Safe Harbor Does Not Apply

Defendants seek to avoid liability for their violations of the Exchange Act by arguing that their alleged misstatements are protected by the PSLRA's Safe Harbor. Def. Br. at 33. The PSLRA's Safe Harbor provision applies only to forward-looking statements "accompanied by meaningful cautionary" language "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A). To be clear, the safe harbor does *not* apply to "misstatements or omissions of historical or contemporaneous facts." *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1229 (S.D. Fla. 2007). To qualify as meaningful cautionary language, a statement's warning must advise the public of "risks of a significance similar to that actually realized." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). Such statements are exempt from liability on the basis that "the cautionary language renders any misrepresentation immaterial." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001).

The Eleventh Circuit has held that for a plaintiff to be put on notice, disclaimers must be "explicit or specific as to the fraud alleged" in the Complaint

in order to place investors "on actual notice. *La Grasta v. First Union Securities, Inc.*, 358 F.3d 851 (11th Cir. 2004)." Thus, the application of the PSLRA Safe Harbor "involves a factual dispute that is not appropriately resolved at the pleading stage." *In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964, 972 (N.D. Cal. 2009); *In re Netbank, Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 69030, *25 ("[B]ecause this case is still at the Motion to Dismiss stage, the Court concludes that it would be imprudent at this juncture to grant Defendants' Motion to Dismiss based on the safe harbor provision.") (internal citation omitted).

Here, Defendants contend that their generic risk disclosures accompanying purported forward-looking misstatements regarding HomeBanc's liquidity, loan originations, interest rate risk, and credit and risk evaluation policies foretold "the precise concerns that might and did eventually come to pass" despite disavowing any "crystal ball with which to predict the mortgage crisis that has devastated the world financial markets," Def. Br. at 2-3, and shield them from liability. *See* Def. Br. at 36-40. Defendants are wrong for three reasons.

First, even to the extent that Defendants' so-called risk disclosures concerned forward-looking matters, the PSLRA's Safe Harbor protections are unavailable because the Company's generic boilerplate risks disclosures— cautioning of risks so lacking in specificity that they could apply to virtually any financial institution—were inadequate. As the late Judge Pollack of the Southern

District of New York colorfully explained, the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[3] Thus, to the extent that any of Defendants' statements were forward-looking, Defendants still cannot invoke the PSLRA Safe Harbor because they failed to accompany them with cautionary language "sufficiently specific to render reliance on the false or omitted statement unreasonable." *In re Globalstar Sec. Litig.*, No. 01-1748, 2003 WL 22953163, at *8 (S.D.N.Y. Dec. 15, 2003). "General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution: To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Prudential,* 930 F. Supp. at 72. Cautionary language "must precisely address the substance of the specific statement or omission that is challenged." *Id.*; *La Grasta,* 358 F.3d at 851. Generic or boilerplate statements are not sufficient. *See Abbey*, 423 F. Supp. 2d at 361 ("As the Second Circuit has stated, warnings will not dispel liability where defendants 'gloss over the relevant

---

[3] Cautionary language "requires a contextual analysis and, in context, even apparently specific risk disclosures . . . are misleading if the risks are . . . significantly greater or more certain than those portrayed in the [public statements]." *Prudential,* 930 F. Supp. at 72 (citation omitted).

risk, focus investors' attention elsewhere, and thereby lead them down some primrose path'") (citations omitted). Here, Defendants' generic and boilerplate statements, which fail to warn that the Company would materially misrepresent its loan origination pace and liquidity requirements, would fail to abide by its own credit and risk evaluation policies, and would violate its underwriting standards, are not sufficient.

Second, Defendants' loan origination statements are not forward-looking; they are misstatements of historical or current fact that are not protected by the PSLRA Safe Harbor. *See* ¶¶59, 66, 86, 102, 110, 138. Here, Defendants' statement, that "our loan originations ***continue to*** outpace industry trends as a result of our continued success in developing SMAs and maintaining our focus on the purchase money mortgage market . . . [,]" is an unequivocal statement of contemporaneous and historical *facts*, namely, the reasons for HomeBanc's current and historical loan origination performance *vis-à-vis* its competitors. *See Schultz,* 488 F. Supp. 2d at 1229; *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d 1221, 1237 (M.D. Fla. 2008) (finding "Consumer demand's done pretty darn well all year. And demand feels pretty stable . . . ." to constitute "statements of present and historical fact"); *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 686 (6th Cir. 2003) (statement "describing the components of a present charge" was not forward looking). Therefore, Defendants are not entitled to the PSLRA's Safe Harbor protections for their loan origination misstatements.

13

Third, Defendants do no escape liability for the remainder of their identified misstatements, which merely characterize undisclosed *current* adverse conditions as prospective risks. The law is well-settled that the PSLRA's Safe Harbor is unavailable where accompanying language warns of prospective "risks" that have in fact already occurred. *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320-1321 (N.D. Ga. 2001) ("The plaintiffs do not contend that the statements in the prospectus are false or misleading because of later events, but rather, that they are false or misleading because of events that had already occurred at the time of the SPO. A claim of this type is not barred by the safe harbor for "forward-looking" statements or the "bespeaks caution" doctrine."); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007) ("Here, unfavorable *events had already occurred* when Merchant made its optimistic statements, which made those statements materially misleading.") (emphasis added).

As a result, Defendants are liable for their misstatements regarding HomeBanc's interest rate risk and credit and risk evaluation policies because accompanying language merely recast undisclosed *current* adverse conditions as prospective risks. *See* Def. Br. at 40. In fact, that is precisely what the Complaint alleges. *See* ¶¶79, 89, 98, 113, 131, 141. At the time Defendants made their statements regarding potential future interest rate risk, HomeBanc had already dramatically increased their interest rate risk by failing to abide by the Company's

own credit and risk evaluation policies and by loosening underwriting standards to focus on what investors might buy. ¶89. Accordingly, the Court should deny Defendants' request for dismissal on such grounds.

Likewise, Defendants cannot avoid liability for their material misstatements distinguishing HomeBanc's experience with credit evaluation as a competitive advantage over its competitors. Defendants contend that because they stated that "[w]e *may* be unable to effectively mitigate the risk of changes in interest rates, *which could* adversely affect our earnings," they can hide behind the PSLRA's Safe Harbor. Def. Br. at 43 (emphasis added). Again, Defendants are wrong. The Complaint adequately pleads that, at the time of this purported warning of possible future risks, HomeBank was *already* failing to comply with its own credit and risk evaluation policies and was unable to manage risk effectively. ¶79. Defendants' attempt to recast the material omission of existing adverse conditions as possible future risks cannot succeed. *See Merchant Capital, LLC*, 483 F.3d at 768; *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d at 1320-1321.[4]

---

[4] Similarly, Defendants' attempt to spin their statements concerning HomeBanc's liquidity position and requirements does not cure their failures to disclose the Company's then-existing liquidity crisis. Defendants contend that their statement that "*[i]f* we don't generate sufficient liquidity, *we will be* unable to conduct our operations as planned" and "*[s]hould* our liquidity needs exceed these ongoing or immediate sources of liquidity . . . our mortgage loan portfolio *could be* sold to raise additional cash," Def. Br. at 36-37 (emphasis added), adequately revealed the Company's then-existing liquidity problems. Not only are these statements so overbroad as to be applicable to virtually any company in any business, but as the

**D.    Defendants Have Failed to Demonstrate That Their Actionable Misstatements Are Mere Puffery**

Defendants' characterization of their material public misstatements as mere puffery (Def. Br. at 42) also fails. "[W]hether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made." *Rosen v. Textron*, 321 F. Supp. 2d 308, 320 (D.R.I. 2004). Consequently, this determination should be made by the trier of fact and not by the court at the motion to dismiss stage. *See*, *e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) ("Whether the opinion or 'soft information' is indeed actionable depends on all relevant circumstances of the particular case, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action."). Moreover, "[a] statement can be dismissed as puffery as a matter of

---

Complaint pleads, at the time of these disclosures, these risks had already materialized because "substantial decreases in loan originations **affected** the Company's viability as a going concern[.]" ¶¶33-34, 91, and HomeBanc was already suffering a liquidity crisis impeding the Company's ability to conduct operations as planned. For the same reasons, Defendants' argument that their purported cautionary language that "[a]ny sustained period of increased payment delinquencies, foreclosures or losses **could** adversely affect . . ." and "***would*** significantly harm . . .," shields them from liability for their material misstatements regarding HomeBanc's liquidity also fails. Def. Br. at 37 (emphasis added). As the Complaint adequately pleads, when these statements were made HomeBanc was already suffering from a falloff in loan originations and increased default rates that threatened the Company's viability as a going concern. *See* ¶¶81. Dismissal on such grounds is improper. *See Merchant Capital, LLC*, 483 F.3d at 768; *In re Towne Servs. Sec. Litig.*, 184 F. Supp. 2d at 1320-1321.

law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available." *In re Sci. Atlanta,* 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002). Defendants have failed to even attempt to make this showing with regard to ***any*** specific alleged misstatement, or to show why the statement, in the context in which it was made, was immaterial as a matter of law. Therefore, dismissal on these grounds is not proper.

### E.     Plaintiff's Allegations Support a Strong Inference of Scienter

Defendants argue that Plaintiff has failed to adequately plead scienter. Def. Br. at 12-26. Casually ignoring a 98-page Complaint comprising 194 paragraphs containing the detailed and particularized facts of Defendants' fraudulent conduct—facts confirmed by individuals whose jobs required them to be in close proximity with Defendants on a near-daily basis during the relevant time period—Defendants nevertheless contend that Plaintiff has failed to sufficiently allege facts giving rise to a strong inference of scienter. *Id.* at 13-14. As demonstrated below, the Complaint readily meets the scienter requirements.

### 1.  The Legal Standard for Scienter

The PSLRA provides that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In *Tellabs,* 551 U.S. 308, the Supreme Court

determined the proper standard for alleging scienter under the PSLRA, holding that the appropriate inquiry "*is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter*, *not whether any individual allegation, scrutinized in isolation, meets that standard*." *Id.*, at 323 (emphasis added).[5] "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citations omitted). An inference "at least as likely as competing inferences" warrants recovery. *Id.* at n. 5. Although the Court is permitted to consider plausible alternative inferences that arise from the facts of the Complaint, scienter is adequately pleaded "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Thus, where the competing inferences properly drawn from the facts alleged are in "equipoise," the complaint meets the scienter requirements. *See id.* at 331. *See also City of Brockton Ret. Sys. v. Shaw Group. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("the 'tie . . . goes to the plaintiff'").

---

[5] *See also In re MoneyGram Int'l, Inc.*, 626 F. Supp. 2d 947 (D. Minn. 2009) ("Despite the shortcomings of some of lead plaintiff's additional allegations of scienter, the court determines that, in consideration of the totality of the circumstances . . . a reasonable person could find [] plaintiff's fraud narrative to be cogent and as plausible as defendants' opposing non-fraudulent narrative."). Defendants' reference to *Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368 (M.D. Ga. 2000), a contrary pre-*Tellabs* case on this issue, Def. Br. at 14, is no longer good law.

This "holistic" approach, as Justice Ginsburg characterized it, no longer permits courts to ignore any factual allegations that could support scienter simply because one particular fact, standing alone, would not suffice to meet the scienter requirement. Instead, each such fact must be given some weight, and all facts must be evaluated together to determine whether the totality of the facts alleged gives rise to a strong inference of scienter.[6] Even "vague or ambiguous" allegations must be considered, as "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 324.[7]

The Eleventh Circuit has held that a showing of "severe recklessness" satisfies the scienter requirement. *Grand Lodge of Pa. v. Peters*, 550 F. Supp. 2d 1363, 1368 n. 49 (M.D. Fla. 2008) (*citing McDonald v. Allen Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)). Severe recklessness is defined as "'those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure for the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so

---

[6] Notably, before the Supreme Court's ruling in Tellabs, the Eleventh Circuit had reached the same conclusion. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004) ("We readily join the courts that have interpreted the PSLRA to permit the aggregation of facts to infer scienter.").

[7] Indeed, after *Tellabs*, "the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective," and "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement." *South Ferry LP v. Killinger*, 542 F.3d 776, 784-785 (9th Cir. 2008).

obvious that the defendant must have been aware of it." *Garfield v. NDC Health Corp.*, 466 F. 2d 1255, 1264 (11th Cir. 2006) (citations and internal quotations omitted). *See also McDonald*, 863 F.2d at 814 (same). "In a securities fraud context, severe recklessness can be 'established by allegations that the defendants had knowledge of facts or access to information contradicting their public statements.'" *In re Netbank*, 2009 U.S. Dist. LEXIS 69030, at *37-*38 (quoting *In re Unicapital*, 149 F. Supp. 2d at 1372 (citation and internal quotations omitted)).

### 2. The Complaint Adequately Alleges Defendants Had Actual Knowledge or Were Severely Reckless

The Complaint alleges cogent and compelling facts demonstrating that Defendants knew or were severely reckless in disregarding that HomeBanc was violating its own publicly stated loan underwriting standards; presenting financial results and assets based on a grossly inadequate loss reserve model that Defendants knew did not properly account for the Company's true loss exposure; falsely reassuring investors of HomeBanc's ability to meet liquidity requirements; and, while selling loans at a loss, simultaneously portraying past and continuing success of HomeBanc's loan products, business, and underwriting strategy. ¶¶23-45. In response to these well-founded and well-corroborated allegations of Defendants' knowledge and/or severe recklessness, Defendants feebly argue that "Plaintiffs allege no facts that would distinguish Defendants' conduct . . . from simple

negligence or that would suggest recklessness or intent to defraud." Def. Br. at. 13-14. This argument ignores the numerous accounts of Defendants' actual knowledge or severe recklessness by HomeBanc former employees detailed in the Complaint.

For example, CW4 was HomeBanc's Chief Credit Officer from January 2002 until June 2005. ¶30. As Chief Credit Officer, CW4 reported to Defendant Race, and in 2004, was responsible for developing a loss reserve model for the Company. ¶¶30-31. CW4 described the model he/she created as a "stop-gap" solution that was "not really strong enough to get us past two or three quarters." ¶31. While an adequate loss reserve model would contain approximately 30-40 market variables, according to CW4, the model developed contained only three market variables. ¶31. Despite the gross inadequacy of this model, Defendants continued using it until at least mid-2006, even though they had actual knowledge that it did not reliably estimate the risks of loss. ¶¶30-32. Upon hearing of the model's continued use one year after he left the Company, CW4 was surprised to learn that Defendants had not implemented an appropriate model, especially given that Defendant Race knew that HomeBanc should have used an independent third party to set reserves. *See* ¶32.

As loan originations slowed, and despite repeated assurances to investors to the contrary, *see* (¶¶61, 80, 90, 104, 114, 122, 132, 142), HomeBanc began running into liquidity problems. ¶¶33-34. CW9, a former HomeBanc Senior Vice President

of Secondary Markets who reported directly to Defendant Race, bluntly explained that "there was a lack of operating capital." ¶33. According to CW9, this lack of operating capital was due to Defendant Flood's own failed business model. ¶34. The increasing lack of operating capital and the decreasing amounts of loan origination had the full attention of Defendants Flood and Race. CW3, a former HomeBanc Senior Vice President/National Operations, recounted how Defendant Flood had weekly all-hands meeting calls with senior level executives at which the Company's slowing business was discussed. ¶34.

In addition, Defendant Flood had actual knowledge of HomeBanc's problems with loan officer retention and Defendant Race was at minimum severely reckless with regard to this issue. CW9 explained that as the volume of HomeBanc's loan origination steadily decreased, the Company began to lose "a lot" of loan officers. ¶33. In an attempt to retain top loan officers, HomeBanc began selling loans at a loss (*i.e.*, "scratch and dent loans") while simultaneously painting a false and misleadingly positive picture for the investing public and analysts. ¶35. CW7, a former HomeBanc Vice President/Director of Builder Services, stated that "loans were actually being locked at a loss" and "Patrick Flood let that continue because he didn't want to lose top sales people who were closing loans." ¶35. HomeBanc then had to absorb the losses from these scratch and dent loans, which ultimately depleted the Company's revenues. ¶35.

Defendants seek to shift the Court's analysis of the scienter issue to legally wrong and factually irrelevant matters outside the Complaint. For instance, Defendants argue that their failure to issue a financial restatement precludes a finding of scienter. Def. Br. at 14. Of course, the failure of a defendant to agree to a formal restatement as a basis for negating scienter has been soundly rejected by courts and runs contrary to the controlling dictates of *Tellabs*.[8] As the Complaint adequately alleges, Defendants concealed the fundamentally terminal condition of the Company.  When the Company's true financial condition became clear, far worse than a restatement, it was revealed that HomeBanc could not borrow additional money under its credit agreements and could no longer survive as a going concern. *See* ¶¶158-59.

Defendants also argue that Plaintiff has not adequately pled scienter because "there was no admission of prior misconduct or error" and no corrective disclosure. Def. Br. at 14-15. Defendants' first argument goes too far. While a confession of wrongdoing will certainly provide a strong inference of scienter, if such an "admission of prior misconduct or error" by Defendants was required to plead (or

---

[8] *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.").

prove) scienter, few investors could ever recover under the federal securities laws as defendants rarely voluntarily admit prior fraudulent misconduct. Not surprisingly, Defendants cite no authority in support of their position. Defendants' second argument—that a corrective disclosure is required—simply confuses the question at hand, namely, whether Defendants' misstatements and/or omissions were made with scienter, with evidence demonstrating the Defendants' statements were false.

The allegations of the Complaint make clear that Defendants were fully aware and, at a minimum, were severely reckless, of the Company's serious problems and deliberately acted to conceal them through a series of material misrepresentations and omissions to the public. Therefore, Defendants' premature factual argument that the "strongest inference" is that Defendants were unable to shield themselves from the drastic changes in the housing and mortgage markets, Def. Br. at 22,[9] ignores the detailed factual allegations disallowing any argument

---

[9] In fact, in *Netbank*, where defendants similarly argued that Netbank's demise was not due to its internal problems but rather "a faltering housing market and the resultant damage to mortgage lending operations," 2009 U.S. Dist. LEXIS, at *15, Judge Martin refused to consider that same "macroeconomic" argument extraneous to the complaint offered by Defendants here, noting that "[t]he Supreme Court has set out prescriptions for courts faced with a rule 12(b)(6) motion to dismiss an action governed by the PSLRA, one of which specifically reads: 'courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.' The court is therefore unwilling and unable to make a determination as to the truth of certain facts as alleged in the Complaint, and Defendants Motion to Dismiss must fail on

that HomeBanc's malignant financial condition took Defendants by surprise or that they were mere victims of circumstance.

Defendants' shopworn arguments that Plaintiff is attempting to plead "fraud by hindsight" also fail. These arguments ignore the reality that Defendants knew or were severely reckless in disregarding that HomeBanc's loss reserve model was grossly inadequate (¶¶30-32); that Defendants were closely involved with the violations of loan underwriting standards and the loan approval process (¶¶23-29); that Defendants had weekly meetings regarding the Company's slowing business and growing liquidity problems; (¶¶33-34), and that the Company was forced to sell scratch and dent loans because Defendants wanted to stop the exodus of top loan sales people, (¶35).[10]

---

this basis." *Id.*, at *16-*17 (*quoting Tellabs*, 551 U.S. 208).

[10] Contrary to Defendants' assertions, Def. Br. at 2, this is not a case of "fraud by hindsight." Here, Plaintiff has not failed to allege contemporaneous facts indicating the falsity of the defendants' statements and instead "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones." *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (describing fraud by hindsight). It is not "fraud by hindsight" when statements related to a loan's existing quality and risks were false and misleading when made. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 228-29 (S.D.N.Y. 2008) (rejecting "fraud by hindsight" argument where undisclosed breaches of license agreement, which placed agreement at risk of being terminated, allegedly existed at the time of misstatements). Defendants' reliance on *Tripp v. IndyMac Bancorp, Inc.*, No. CV 07-1635, 2007 WL 4591930, at *10-11 (C.D. Cal. Nov. 29, 2007), is misplaced. The Complaint's well-pled facts do not remotely constitute a "contrast between statements of corporate optimism and later events reflecting the negative impact of market conditions." Def. Br. at 23. There is

Defendants were aware of all of these things. Yet, Defendants continued to make material misrepresentations and omissions to investors. ¶¶46-149. This supports a strong inference of scienter. *See, e.g., In re Sensormatic Elec. Corp. Sec. Litig.*, No. 01-8346-CIV-HURLEY, 2002 WL 1352427, at *6 (S.D. Fla. Jun. 10, 2002) ("Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleadingly, or incomplete-as is alleged here-a classic fact pattern giving rise to a strong inference of scienter appears.").

### 3. The Confidential Witness Statements Support a Strong Inference of Scienter

In this Circuit, the use of confidential sources to provide facts in support of scienter is governed by *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2007). In *Mizzaro,* the Eleventh Circuit held the weight afforded to allegations of confidential sources in a Section 10(b) action "depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider." *Id.* at 1230. The allegations of a confidential witness will not be discounted "if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity

---

nothing concerning a contrast of conditions when, for example, Defendants have actual knowledge of a wholly inadequate loss reserve model, (¶30-32), or are closely involved with the loan approval process and violations of underwriting standards, (¶¶23-29).

to the offending conduct, and the relevant time frame." *Id.* Here, Plaintiff easily

meets the *Mizzaro* standard by specifically identifying the positions held by each

of the confidential witnesses, the time periods in which they were employed, their

proximity to Defendants, and the basis for their knowledge:

| CW | Position | Basis for Knowledge |
|---|---|---|
| 1 (¶10) | Former HomeBanc Senior Vice President of Product Development | CW1 was responsible for developing new loan products and developed both proprietary and mainstream products. CW1 worked at HomeBanc prior to and throughout the Class Period. |
| 2 (¶10) | Former HomeBanc Senior Vice President/Portfolio Manager | CW2 managed the Company interest rate risk of the balance sheet through the Company warehouse debt facility, servicing rights, mortgage backed securities portfolio and valuation. CW2 worked at HomeBanc prior to and throughout the Class Period and beyond. |
| 3 (¶10) | Former HomeBanc Senior Vice President/National Operations | CW3 was in charge of the "operations piece" of Specialty Lending. As described by CW3, Specialty Lending included Builder Services, Sub-Prime, Construction-to-Permanent and Joint Venture. CW3 worked at HomeBanc prior to the Class Period through February 2007. |
| 4 (¶10) | Former Chief Credit Officer | CW4 reported directly to Defendant Race, among others. CW4 worked at HomeBanc prior to the Class Period until summer of 2005. |
| 5 (¶10) | Former HomeBanc Project Manager | CW5 worked at HomeBanc prior to and throughout the Class Period. |
| 6 (¶10) | Former HomeBanc Senior Accountant | CW6 worked at HomeBanc prior to and throughout the Class Period. |
| 7 (¶10) | Former HomeBanc Vice | CW7 worked at HomeBanc prior to the Class |

| | President/Director of Builder Services | Period through spring of 2007. |
|---|---|---|
| 8 (¶10) | Former HomeBanc Default Specialist and Foreclosure Risk Analyst | CW8 was a risk analyst on the foreclosure side of the business, whose group worked on loans HomeBanc serviced that went into delinquency. CW8 worked at HomeBanc prior to and throughout the Class Period. |
| 9 (¶10) | Former HomeBanc Senior Vice President of Secondary Markets | CW9 reported directly to Defendant Kevin Race, among others. CW9 worked at HomeBanc prior to and throughout the Class Period. |
| 10 (¶10) | Former HomeBanc Finance Investor Servicer | CW10 worked at HomeBanc prior to and throughout the Class Period. |
| 11 (¶10) | Former HomeBanc Vice President and Manager of Compliance Quality Control and Audit | CW11 worked at HomeBanc prior to and throughout the Class Period. |
| 12 (¶10) | Former HomeBanc Executive Vice President of Production Operations | CW12 worked at HomeBanc prior to and throughout the Class Period. |

As demonstrated above, all the confidential witnesses, by virtue of their positions, responsibilities, and the times during which they were employed, had more than sufficient basis for making their statements.[11] Indeed, while Plaintiff has cited information from twelve separate and independent confidential witnesses,

---

[11] *See, e.g., Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (noting that a broad range of possible witnesses are reliable sources, and that "any number of company employees would be in a position to infer the issuance of stop-work orders, which would have had the very obvious effect of putting numerous employees out of work.") (citations omitted). Where, as here, the confidential witnesses have a sufficient basis for "the facts to which they are prepared to testify," then "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." *Id.* (internal citations omitted).

Defendants address only two. Def. Br. 26-27.[12] Further, as demonstrated by the foregoing confidential witness statements, Defendants' involvement, knowledge, and approval is a more cogent explanation than any alternative theory of employees secretly acting on their own.[13] Therefore, the statements of the confidential witnesses support a strong inference of scienter.[14]

Lastly, Defendants argue that Plaintiff's use of confidential witnesses precludes a finding of scienter, relying on *Higginbotham v. Baxter Int'l, Inc.*, 544 F.3d 753, 756-57 (7th Cir. 2007). Def. Br. at 24-26. Unfortunately for Defendants, the cited provision of *Higginbotham* is directly contrary to the Eleventh Circuit standard adopted in *Mizarro*, *see* 544 F.3d at 1240, and has been rejected by numerous other circuit courts, including its own Seventh Circuit.[15] Because the

_____

[12] *Mizzaro*, 544 F.3d at 1240; *see also, e.g., Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. Ill. 2008) (the confidential witnesses "from the description of their jobs were *in a position to know at first hand the facts which they were prepared to testify*, such as the returns of the [product], [and that] sales of the [product] were dropping off a cliff while the company pretended that demand was strong…") (emphasis added).

[13] *Id.*, at 711 (the "alternative hypotheses . . . [of] a cascade of innocent mistakes, or acts of subordinate employees, . . . resulting in a series of false statements--are far less likely than the hypothesis of scienter at the corporate level").

[14] In addition, the cogent and compelling inference of scienter is further supported because "[c]orroboration from multiple sources also supports an inference of a scienter[,]" *Makor*, 513 F.3d at 712; *Countrywide*, 554 F. Supp. 2d at 1058 (same), and because the CWs "emanate from several geographic areas" and "span different levels of the Company hierarchy[.]" *Id.* at 1058-69.

[15] *See, e.g., Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 262 (3d Cir. N.J. 2009). *See also Makor,* 513 F.3d at 711-12 (effectively overruling

Complaint's allegations based on confidential witnesses readily meet the requirements of *Mizarro*, they are entitled to appropriate weight.

### 4. The Complaint Adequately Alleges That Defendants Had Motive to Commit Securities Fraud

Although alleging that Defendants had a motive to deceive is not necessary to adequately plead scienter under the PSLRA,[16] the Complaint provides several cognizable motives for Defendants to have committed the alleged fraud, which further support a strong inference of scienter. Indeed, particularized corporate motives can demonstrate scienter. *See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993).[17] The motivation to make the company seem more profitable and artificially inflate stock has repeatedly been found, in totality with other allegations, to give rise to a strong inference of scienter.[18]

---

*Higginbotham* as *sui generis* based on its unusual facts involving a foreign subsidiary).

[16] The absence of motive allegations is not dispositive of scienter. *Tellabs,* 551 U.S. at 325.

[17] *See also Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding scienter where complaint alleged that defendants knowingly made false statements in order to inflate its share price, which, in turn, allowed it to acquire other companies it would not have otherwise been able acquire); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (strong scienter inference raised where defendants allegedly delayed impairment charge to complete stock offering); *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 444-45 (S.D.N.Y. 2000) (motivation to inflate IPO price); *In re Centocor, Inc. Sec. Litig. III,* No. 98-260, 1998 U.S. Dist. LEXIS 18909, at *8-9 (E.D. Pa. Dec. 1, 1998) (allegations that defendants wanted to complete offering pled scienter).

[18] *See In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262 at

Here, HomeBanc and Defendants Flood and Race benefitted from concealing the true extent of HomeBanc's problems for as long as possible because, as shown above, the Company's artificially inflated stock price provided the opportunity to raise badly-needed operating capital while absorbing losses from scratch and dent loans and the Company's failed SMAs. ¶¶33-35. As the Complaint alleges, "the real problem with respect to liquidity was a lack of operating capital." ¶33. Further, as confirmed by CW9, with respect to HomeBanc's business model and SMAs, the Company "had a platform that could handle $5 billion a month, but we only had about $500 million incoming loans, so expenses were way out of hand." *Id.* Thus, Defendants' argument for dismissal merely "confuses expected with realized benefits." *Makor*, 513 F.3d at 710 (rejecting Defendants' argument for lack of motive based on absence of financial gain). Further, concealing the extent of HomeBanc's problems was also a means by which Defendants ensured employee loyalty. CW11, a former HomeBanc Vice President and Manager of Compliance Quality Control, recalled that Defendant

---

*52-53 (D. Or. Jan. 3, 2006), ("Defendants argue that many of these alleged motives -- keeping the stock price high, raising capital, increasing the value of stock options and other executive incentives -- are normal goals of every business . . . [however] when viewed in the totality of all the other allegations, [they] add additional weight to the inference of scienter."); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 327-328 (S.D.N.Y. 2001) ("[t]he desire to maintain an inflated stock price may . . . be sufficiently specific support for an allegation of scienter . . . and the analysis is a highly fact-intensive one").

Flood considered the departures of salespersons to other mortgage lenders such as Countrywide and Wells Fargo as acts of personal disloyalty[19] to him, and fully understood the negative effect that those departures were having on the Company. ¶38. Therefore, the allegations of the Complaint, when read holistically, support a strong inference of scienter.[20]

### 5. Absence of Stock Sales Does Not Negate Scienter

Defendants attempt to advance the argument that Plaintiff fails to allege a motive and devote several pages to discussing their own purported stock trading patterns. Def. Br. at 16-19. This was a futile exercise. At this stage of the proceedings, prior to any discovery, it unclear whether Defendants were prevented

---

[19] It is highly likely that Mr. Flood had enormous personal motivation to keep his position with the Company, since, unlike most top executives of large public companies, he had been with HomeBanc and its predecessors since graduating from college in 1985. *See* HomeBanc Form S-11 filed with the SEC on March 19, 2004.

[20] *See In re Williams Secs. Litig.*, 339 F. Supp. 2d 1206, 1234 (N.D. Okla. 2003) ("the Complaint alleges that Defendants had a strong motive to misrepresent WCG's financial statements because WCG's continued viability was dependent upon certain measures of WCG's financial performance, including the Company's EBITDA, revenues and asset values, which were directly linked to WCG's debt and bank covenants"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648 (E.D. Va. 2000) (particularized allegations that company was "further motivated [by a desire] . . . to portray the Company favorably with actual and potential creditors from whom MicroStrategy needed to borrow funds" was sufficient to plead motive); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2004 U.S. Dist. LEXIS 7015, at *28-29 (S.D.N.Y. April 22, 2004) (finding scienter where defendants sought to expand their enterprise and were motivated to engage in fraud in order to attain that goal).

from making stock sales by some undisclosed factor, such as Company policy. Furthermore, both the Supreme Court and the Eleventh Circuit have made clear that suspicious stock sales are not necessary to create a strong inference of scienter. Instead, the presence or absence of such allegations must be assessed in light of all the allegations found in the complaint." *Mizzaro*, 544 F.3d at 1253 n.3 (*citing Tellabs I*, 127 S. Ct. at 2511.) Thus, courts routinely deny motions to dismiss in securities class actions where no insider trading is alleged. *See, e.g., La Grasta v. First Union Securities, Inc.*, 358 F.3d 840 (11th Cir. 2004).[21] Further, just as in *In re Netbank*, "Defendants provide no legal support for their assertion that the absence of Class Period stock sales negates previously determined inferences of scienter, the court declines to dismiss plaintiffs' claims on this basis." 2009 U.S. Dist. LEXIS 69030, at *41. Therefore, Defendants have failed to make a case for dismissal on such grounds.

---

[21] It is well-settled that the absence of insider trading does not negate or undercut scienter allegations. *See also P.R. Diamonds Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004); *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344-45 (N.D. Cal. 2000); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1255 (N.D. Cal. 2008) ; *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-01265, 2008 U.S. Dist. LEXIS 47748, at *39 (D. Colo. Mar. 28, 2008); *In re Ravisent Techs.*, No. 00-1014, 2004 U.S. Dist. LEXIS 13255, at *40 n.23 (E.D. Pa. July 12, 2004); *Ramp Networks Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1074 n.6 (N.D. Cal. 2002); *Aldridge v. A.T. Cross Corp.*, 284 F. 3d 72 (1st Cir. 2002).

### 6. Disclosures of Boilerplate Risks Do Not Negate an Inference of Scienter

Defendants would next have the Court believe that the standard boilerplate disclaimers from HomeBanc's 2005 Form 10-K and several Form 10-Q's are instead "explicit disclosures of pertinent facts and risk factors" which "negate inferences of scienter." Def. Br. at 20. As previously noted, the Eleventh Circuit has held that for a plaintiff to be put on notice, disclaimers must be "explicit or specific as to the fraud alleged." *See La Grasta*, 358 F.3d at 851.

Here, Defendants' "prominently disclose[d] key risks" include "declining real estate values," and a "sustained period of increased payment delinquencies, foreclosures or losses." Def. Br. at 19-20. However, nowhere in the Complaint does Plaintiff allege that Defendants caused declining real estate values or a sustained period of payment delinquencies, foreclosures, or losses. Rather, Plaintiff details how Defendants engaged in unsound business practices by violating the Company's loan underwriting standards, using a grossly inadequate loss reserve model, falsely touting its ability to meet liquidity requirements, and selling loans at a loss while simultaneously painting a misleadingly positive picture to investors regarding the Company and its loan products. ¶¶23-45. Despite Defendants' attempt to hide behind cautionary language, there are simply no disclosures warning that Defendants may cause HomeBanc to violate its own loan underwriting standards, to use a grossly inadequate loss reserve model, or to

materially misrepresent its liquidity requirements. Quite simply, nothing in these standard boilerplate disclosures negates anything that was revealed by the confidential witnesses in the Complaint.

### F.    Plaintiff Has Adequately Pled Loss Causation

#### 1.  Legal Standards For Pleading Loss Causation

Defendants' contention that "Plaintiffs fail to allege the requisite 'loss causation,' as they do not plead any facts that remotely amount to a corrective disclosure or revelation of fraud that would distinguish HomeBanc's fate from the industry-wide collapse of the mortgage industry," (Def. Br. at 4), fundamentally misconstrues the requirements for pleading causation. [22]

In *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005), the Supreme Court explained that the loss causation pleading requirements in Section 10(b) cases are "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal

---

[22] As a preliminary matter, Defendants confuse "loss causation" with "transaction causation" (*i.e.,* reliance). To plead reliance, plaintiff need only make "an allegation that but for the deceptive act, the plaintiff would not have entered into the securities transaction." *Stoneridge*, 552 U.S. at 170 (Dissent, J. Stevens) (citing *Lentell v. Merrill Lynch & Co.,* 396 F. 3d 161, 172 (2d Cir. 2005)). Plaintiff has satisfied that element by alleging that he purchased HomeBanc securities by "relying directly or indirectly on the false and misleading statements made by the defendants." ¶187. Plaintiff also invokes the fraud-on-the-market doctrine with regard to reliance. ¶¶178-79; *see Basic, Inc.*, 485 U.S. at 241-49.

connection that the plaintiff has in mind." *Id.* at 346-47 (citations omitted).

The Complaint alleges that the price of HomeBanc shares was artificially inflated, *see* ¶¶ 177, 181, and alleges that Defendants' material misstatements and omissions during the Class Period "***directly and proximately caused economic loss***" to Plaintiff and the Class when the truth about HomeBanc was revealed. ¶¶ 175-76. As discussed herein, Plaintiff has met the causation pleading requirement.

Defendants attempt to have this Court prematurely resolve numerous fact-intensive questions that can only be answered after discovery and expert analysis and testimony.[23] At the pleading stage, however, Plaintiff has adequately alleged the connection between his loss and the Defendants' alleged misstatements and omissions. *See*, *e.g.*, *In re Netbank,* 2009 U.S. Dist. LEXIS 69030 at *46 (analysis of post-statement drops in stock price during a class period is a complex factual endeavor requiring expert consultation and evidence, and completely inappropriate at the motion to dismiss stage).

---

[23] *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("[i]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.") (cited with approval in *Dura*, 544 U.S. at 340). *See also In re Netbank*, U.S. Dist. LEXIS 69030 at *46; *In re PSS World Med., Inc. Sec. Litig.,* 250 F. Supp. 2d 1335, 1358, 1351 (M.D. Fla 2002).

## 2. Price Declines During The Class Period Do Not Negate Loss Causation

The Complaint is replete with allegations detailing the causal connection between Defendants' misrepresentations and the Class members' economic loss (*e.g.*, ¶¶ 150, 153, 155-158). In their "background" section, Defendants make the irrelevant and factually erroneous point that "HomeBanc's announcements during the putative class period consistently were followed by decreases – not *increases* – in its stock price." Def. Br. at 7 (italics in original). This "fact" is inconsistent with the well-pleaded allegations of the Complaint as well as the stock price movement during the Class Period. Defendants' failure to cite a single case holding loss causation cannot be adequately pleaded where one or more of the alleged false statements did not cause an *increase* in the issuer's stock price is unsurprising: Defendants' position is flatly wrong on the law.

Indeed, Defendants' focus on whether a misrepresentation or omission caused an *increase* at the time the misstatement was issued harkens back to pre-*Dura* law and ignores the controlling holding in that case by the Supreme Court. In *Dura*, the Supreme Court explicitly rejected the concept that loss causation could be adequately pleaded by showing that "the price of stock on the date of purchase was inflated because of the misrepresentation." *Dura*, 544 U.S. at 342. Defendants' argument here has already been expressly rejected by the Supreme Court. The correct loss causation analysis under *Dura* and its progeny focuses on the share

37

price's decline ***after disclosures*** of facts that reveal the truth that was concealed or misrepresented by defendant's misconduct. *See Dura*, 544 U.S at 347; *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) ("Plaintiffs' economic loss was not that they purchased stock at inflated prices; rather, their economic loss was the decline in their stock value that was the direct result of [the company's] misrepresentations.").

In *Demarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004), the court rejected the identical argument that defendants make here. Finding that the determination of the causes of the stock decline are appropriately reserved for the finder of fact, *id.* at 124, the *Demarco* court explained that "the fact of gradual price decline is not inconsistent with the theory that the price was artificially inflated, since the misrepresentations may well have buoyed a price that would otherwise have sunk much faster, thus raising the price at which plaintiffs purchased the stock." *Id.* at 124. *See also Montoya v. Mamma.Com, Inc.*, No. 05-cv-2313, 2006 U.S. Dist. LEXIS 13207, *26 (S.D.N.Y. Mar. 28, 2006) (same); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009) ("The court finds that 'the mere absence of a statistically significant increase in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock. Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent

statement conveys that the company has met market expectations, when in fact it has not.'") (quoting *In re Scientific-Atlanta,* 571 F. Supp. 2d at 1340-41).

### 3. Arguments Regarding External Economic Conditions May Not Be Properly Considered To Defeat Loss Causation

Defendants' causation arguments hinge almost entirely on their unsubstantiated and fact-intensive propositions that "Plaintiffs' losses, to the extent they have any, are not the result of fraud, but stem from the unexpected collapse of the real estate mortgage markets." Def. Br. at 26. This premature, fact-based argument confuses pleading loss causation with *proving* the amount of damages.

At the beginning of the Class Period, HomeBanc preferred shares were offered at $25.00 per share, ¶49, and immediately preceding the beginning of the partial disclosures, HomeBanc's common stock was trading as high as $2.08 per share, ¶153; following the disclosures at the end of the Class Period, HomeBanc's preferred stock's lowest price was $10.89 per share, ¶155, and the common stock had dropped to $0.30, ¶156. Investors clearly suffered a loss. The amount of those losses, *i.e.,* damages, resulting from Defendants' fraud is, however, irrelevant to whether Plaintiff alleges loss causation. "[L]oss causation addresses the ***existence of damages***, not their precise allocation. . . . [T]his, the factfinding underlying damage allocation is a jury question not resolvable - or even reachable - on class certification," *In re HealthSouth,* 257 F.R.D. at 284 (emphasis added), and

certainly not on an earlier motion to dismiss. *See also In re Vivendi Universal,* 2009 U.S. Dist. LEXIS 34563 at *45 ("While the plaintiffs at all times bear the burden on loss causation, it is important not to confuse causation with damages when comparing competing causes for a stock decline. In theory, plaintiffs need only prove that they suffered *some* damage from the fraud. Liability obviously does not hinge on how much damage.").

Indeed, where a complaint pleads the timing and magnitude of the stock drop after a disclosure, it "negates any inference that the loss suffered by Class members was caused by" other factors and not the disclosure and therefore "Defendants misrepresentations during the Class Period were the proximate cause of plaintiff's losses." *In re LDK Solar Sec. Litig*., C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425, *49-*50 (N.D. Cal. May 29, 2008).

In *In re Netbank,* 2009 U.S. Dist. LEXIS 69030, a recent decision involving a company that also went bankrupt after the failure of its acquisitions of mortgage companies, Judge Martin rejected defendant's contention, similar to Defendants' arguments here, that plaintiffs failed to allege loss causation where "the information released to the public related to prior reports of declining performance [in the mortgage market] that were already known to investors" and the one allegation where the stock lost value in response to a disclosure had nothing to do with revealing the "truth" of alleged prior misstatements or omissions. *Id.* at *42.

Instead, the *Netbank* court found that "plaintiffs have done more than provide defendants with notice regarding the loss as well as the 'causal connection' that they have 'in mind.'" *Id*. at *46. The allegations the court found sufficient for loss causation included that beginning in October 2006 "the investing public learned of adverse facts and circumstances, [including resignation/firing of the company's CEO, resignation of the auditor, reports of dismal financial results, delays in reporting and filing financial results] attributable to the fraud alleged and that as a result, the price of Netbank stock suffered numerous declines," and in May 2007, the company disclosed the substantial deficiency of its core banking business, its failure to meet regulatory capital requirements, and the forced sales of certain portions of its company that amounted to admissions that its books and valuations were grossly overstated and misstated, which led to a further stock price decline. *Id*. at 45-46 (internal quotations omitted).

Defendants' attempt to blame external economic conditions for the disintegration of the value of HomeBanc's stock price is a strategy that has been repeatedly rejected by the courts. For instance, in *Netbank*, Judge Martin rejected the defendants' attempt, like Defendants here, to point to the financial crisis as the news that brought down Netbank's stock price, rather than the revelation of the wrongdoing that led to the company's ultimate collapse. *See* 2009 U.S. Dist. LEXIS 69031 at *42. Other courts have likewise refused to allow defendants to

blame outside economic factors to defeat loss causation at the pleading stage. *See,*
*e.g.*, *In re Countrywide Fin.*, 588 F. Supp. 2d at 1173-74 (the Court found that in
regard to another mortgage company that "[i]t is not the Court's role to speculate
on the causes of the current economic situation. . . . The Court will not be
distracted by liquidity versus solvency and other macroeconomic arguments."); *In*
*re 2007 Novastar Fin., Inc.*, No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS
44166, at *5-6 (W.D. Mo. June 4, 2008) ("[J]ust as the Court could take judicial
notice of the fact that the country suffered from the Great Depression in the 1930s,
the Court cannot use that fact to infer anything in particular about a business
operating at the time. In short, while the Court can take judicial notice of the fact
that the Company's industry suffered reversals, the Court cannot take judicial
notice of the impact of those industry-wide reversals on the Company.").

Defendants also argue that Plaintiff's loss causation allegations are
inadequate because the adverse information disclosed in the progressive negative
revelations at the end of the Class Period fails to "actually correct[] the falsity" of
the Class Period statements. Def. Br. at 29.[24] Courts, however, have repeatedly

---

[24] Defendants' citation to *Leykin v. AT&T Corp.,* 423 F. Supp 2d 229 (S.D.N.Y.
2006), in support of their contention that disclosures must "reveal[] the falsity of
any previous statement the Defendants made," Df. Br. at 29, does not apply. In
*Leykin*, the court specified that while general and conclusory allegations linking
defendants' misstatements with a liquidity crisis were insufficient to plead loss
causation, "a concealed risk can lead to a decline in stock price either because a
corrective disclosure reveals the falsity of the misrepresentations or omissions, *or*

rejected the contention that to establish loss causation, a plaintiff must show a stock drop following an explicitly curative disclosure.[25] Although the loss causation inquiry typically involves the inflation-disclosure-deflation cycle, loss causation is not limited to that scenario as *Dura* itself, and decisions in this Circuit, make clear. In *Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187 (N.D. Ga. 2007), the court did not find *Dura* "to mandate a corrective disclosure" and therefore declined to impose one on the plaintiffs. *Id.* at 1205 (citing *Dura*, 544 U.S. at 346) (the decision explained that it "need not and d[id] not, consider other proximate cause or loss-related questions"). The *Coca-Cola* court reasoned that requiring a plaintiff to show a corrective disclosure in order to plead loss causation could have problematic results:

> This is one of the defects in a rule that allows damages only where a

---

because the risk which was concealed materializes and causes the price decline." *Id.* at 240 (emphasis added). In *Leykin*, plaintiffs failed to allege in regard to any of the six alleged misstatements *either* a corrective disclosure revealing the falsity of the misrepresentations or omissions *or* a materialized concealed risk. By contrast, here Plaintiff has alleged both specific corrective disclosures about the subject of defendants' misstatements and omissions and materialization of the concealed risks.

[25] *See*, *e.g.*, *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("This language suggests that a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity"; collecting cases); *Freeland v. Iridium World Commc'nc, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.").

> corrective disclosure is pleaded … It allows the issuer who has perpetrated a fraud to "walk" the stock price down with other bad news--which may or may not permit others to suspect the truth and reduce their expectations for the stock--all the while continuing to conceal the fraud until such point that the market yawns when the truth is ultimately admitted.

*Id*. at 1205 (internal quotation omitted). Moreover, loss causation can be premised on partial disclosures that do not reveal the truth or undisclosed risks. *See, e,g., Dura*, 544 U.S. at 342 (loss causation met where shares sold after "relevant truth *begins* to leak out.") (emphasis added).

Defendants' argument that "securities fraud plaintiffs must allege that the "misrepresentation . . . caused the security's subsequent decline in value." Def. Br. at 28, is premised on a complete misunderstanding of the loss causation element and a misstatement of the holding of *Lentell*, 396 F. 3d 161, which Defendants cite to support this proposition. As *Lentell* actually held, "to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e*., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id*. at 173 (emphasis in original).

Thus, to adequately plead loss causation, the revelation at the end of the class period need not be the "mirror image" of the misrepresentation or omission made during the class period, or reflect a confession that a prior statement was false when made. Rather, a plaintiff may plead loss causation by means of "a

corrective disclosure or a materialization of risk." *In re 21st Century Holding Co. Sec. Litig.*, 2008 U.S. Dist. LEXIS 108196 (S.D. Fla. Nov 7, 2008) (citing *In re Teca Energy, Inc. Sec. Litig,.* 2006 U.S Dist. LEXIS 73833 (M.D. Fla. Oct 10, 2006) ("In cases involving allegedly fraudulent omissions, courts have at times not required a specific 'corrective disclosure,' but have required adequate allegations of 'materialization of the concealed risk.")). Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the ***underlying circumstance that is concealed or misstated.***" *Lentell*, 396 F.3d at 173 (emphasis added). In other words, the ***"relevant truth"*** required under *Dura* is ***not that a fraud was committed*** *per se*, but the truth about the company's underlying condition and prospects that, when revealed, causes the "economic loss." *See, e.g., In re Interlink Electronics, Inc.*, No. 05-cv-08133, 2008 U.S. Dist. LEXIS 84463, *14 (C.D. Cal. Oct. 6, 2008) ("To plead loss causation, 'the complaint must allege that the ***practices*** that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses.'") (emphasis added) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1063 (9th Cir. 2008)). Defendants' view that only mirror image revelations of Defendants' misconduct will suffice to satisfy causation is plainly wrong. *See also Lentell,* 396 F.3d at 173 (for pleading purposes, loss causation

exists "if the risk that caused the loss was within the *zone* of risk concealed by the misrepresentations and omissions alleged by a disappointed investor").

The Second Circuit decisions in *Emergent Capital,* 343 F. 3d 189, 198-99, and *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F. 3d 87 (2d Cir. 2001), are particularly instructive. In *Suez*, defendants, in soliciting plaintiffs' investment, provided plaintiffs with a report on the backgrounds of the company's principal executive that omitted significant negative information about the executive's prior financial and business history. *See Suez*, 250 F. 3d at 93-94. Ultimately, the company filed for bankruptcy, and plaintiffs' investment became worthless. Later the executive's true poor management experience came to light, and was alleged by plaintiffs to have been a material omission from the initial report. Plaintiffs thus claimed, *inter alia*, that the executive's concealed inability to manage debt and maintain adequate liquidity were the proximate cause of the company's bankruptcy – the disclosure that signaled the loss. *See id*. The Second Circuit in *Suez* (and *Emergent*) agreed, finding that the executive's concealed lack of experience could have induced the company's failure and, therefore, was a ***sufficient causal link*** to the cause of the investors' eventual loss (*i.e.*, the decline in value of the shares upon the bankruptcy filing) to satisfy the loss causation requirement under the Exchange Act. *See Emergent*, 343 F. 3d at 189-99 (quoting *Suez*, 250 F. 3d at 98-99).

The situation addressed in *Suez* and *Emergent* clearly parallels HomeBanc's situation because HomeBanc also concealed information from investors that was a sufficient causal link to the company's ultimate collapse. Plaintiff alleges that the true facts began to be revealed through disclosures beginning on May 10, 2007 and ending on the last day of the Class Period. On May 10, HomeBanc filed a 10-Q which informed investors that they "should not rely upon" HomeBanc's business strategy and reported a consolidated net loss attributable to holders of common stock, (¶151); a decrease in the value of the Company's investment portfolio assets (*id*.); a decrease in mortgage loan origination (*id*.); and a decrease in net interest income (*id*.). These revelations directly contradict, or show the materialization of risks concealed in, statements during the Class Period that HomeBanc was focused on high-quality prime residential mortgage loans (¶¶ 50, 52, 74, 78, 130); that its business strategy included applying loan underwriting guidelines and practices and other quality control measures (¶¶ 52, 74, 123, 126); that its loan originations were growing, and outpacing growth in the overall market (¶¶ 59, 66, 86, 102, 110, 138); that their business strategy included internal controls and disclosure controls and procedures (¶¶ 63, 82, 92, 106, 116, 134, 144); and that the Company's investment portfolio was "in good shape" and provided a foundation of earnings for the Company (¶¶ 97, 119). After the 10-Q report was issued, the price of HomeBanc common shares declined 16.8% in two days and the price of

47

HomeBanc's Preferred Stock declined 18.4% in two days. ¶153.

The next partial disclosure occurred on July 30, 2007, when HomeBanc filed a Definitive Proxy Statement with the SEC containing a detailed disclosure of payments to officers and directors upon termination or change of control. ¶155. This filing following a period of uncharacteristic silence regarding the Company's 2007 second quarter financial results caused the public to further question HomeBanc's future viability. *Id.* In fact, this disclosure demonstrated the materialization of a risk caused by Defendants' Class Period material misstatements regarding future viability (¶¶ 80, 119, 123). HomeBanc stock dropped more than 48% within 72 hours. *Id.*

Next, on August 6, 2007, HomeBanc filed a Form 8-K and announced that the New York Stock Exchange had notified HomeBanc on August 3, 2007 that it had suspended the listing of the Company's common stock and Series A Preferred Stock due to HomeBanc's "abnormally low" common stock trading price. ¶156. That release also contained a second amendment to the Master Repurchase Agreement, which stated that HomeBanc was required to provide J.P. Morgan with "daily and weekly reports regarding margin calls, liquidity position, operating budget, and asset dispositions." ¶157. These revelations represented to investors a direct materialization of risks concealed by Defendants' Class Period statements regarding hidden strengths in the Company's stock price (¶119); the Company's

strong liquidity position (¶¶ 80, 90, 96, 104, 114, 122, 132, 142); the Company's income and asset portfolios (¶¶ 66, 96, 119, 122, 142); and the Company's future viability (¶¶ 80, 119, 123). *See, e.g.*, *City of Sterling Heights Police & Fire Retir. Sys. v. Abbey Nat'l., PLC.*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (causation adequately pled where plaintiff alleged that defendant concealed the magnitude of the risk associated with its credit provisioning and the concealed risk materialized following the announcement of lower than expected profits and massive write-offs and provisioning in defendant's Wholesale Banking portfolio, thereby exposing defendant's lack of adequate credit provisions and its stock price foreseeably declined).

These disclosures related to the issues at the heart of the Complaint, including HomeBanc's loan origination volume, investment portfolio strengths, business strategy, liquidity position, and its overall viability, and adequately provide the necessary casual link between Defendants' alleged misstatements and omissions and the declines in the Company's share price that occurred in the course of the Class Period as partial adverse information about HomeBanc entered the market—culminating in the revelations between May and August 2007 of the full extent of Defendants' misconduct and the materialization of the risks that Defendants previously concealed regarding HomeBanc's true operations, practices, and financial condition. *See, e.g., In re Countrywide,* 588 F. Supp. 2d at 1201.

Plaintiff has therefore adequately pleaded loss causation.

### G.    Plaintiff's Control Person Claims Are Adequate

Defendants' sole argument for dismissal of Plaintiff's claims for control personal liability is predicated on the absence of primary liability under Section 10(b). However, as discussed above, the Complaint properly pleads underlying violations of the Exchange Act against Defendants. Accordingly, Plaintiff has properly pled that Defendants are also liable as control persons under Section 20(a). *See In re PainCare Holdings Secs. Litig.*, 541 F. Supp. 2d 1283, 1294 (M.D. Fla. 2007) ("As Defendants' sole basis to dismiss the control person claim under Section 20(a) is a failure to allege primary liability under Section 10(b), the Court's determination that a cause of action under 10(b) has been adequately pled moots this contention.").

## III.    CONCLUSION

For the foregoing reasons Defendants' motion to dismiss should be denied in its entirety.

Dated: November 19, 2009                Respectfully submitted,

                                        /s/ David A. Bain
                                        David A. Bain
                                        Georgia Bar No. 032449
                                        LAW OFFICES OF DAVID A. BAIN, LLC
                                        1050 Promenade II
                                        1230 Peachtree Street, NE
                                        Atlanta, GA 30309

(404) 724-9990
(404) 724-9986 (facsimile)
dbain@bain-law.com

**Liaison Counsel for the Class**

Lewis S. Kahn
KAHN SWICK & FOTI, LLC
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Tel: (504) 455-1400
Fax: (504) 455-1498
lewis.kahn@ksfcounsel.com

Kim E. Miller
KAHN SWICK & FOTI, LLC
500 5th Avenue, Suite 1810
New York, NY 10110
Tel: (212) 696-3730
Fax: (504) 455-1498
kim.miller@ksfcounsel.com

-and-

David A.P. Brower
BROWER PIVEN, P.C.
488 Madison Avenue
New York, NY 10022
Tel: (212) 501-9000
Fax: (212) 501-0300
brower@browerpiven.com

**Co-Lead Counsel for Lead Plaintiff and the Class**

## <u>Local Rule 7.1D Certification</u>

Counsel for Plaintiff hereby certifies that the text of this memorandum has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1B.

<u>/s/ David A. Bain</u>
David A. Bain
Georgia Bar No. 032449
LAW OFFICES OF DAVID A. BAIN, LLC
1050 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
(404) 724-9990
(404) 724-9986 (facsimile)
dbain@bain-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of November, 2009, I electronically filed the foregoing "LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT" with the Clerk of Court using the CM/ECF system, which will automatically send an e-mail notification of such filing to the following attorneys of record:

Christopher Steven Jones    CJones@saxenawhite.com, e-file@saxenawhite.com

David A.P. Brower    brower@browerpiven.com

David Andrew Bain    dbain@bain-law.com

Emily Louise Shoemaker    emilyshoemaker@paulhastings.com

John Garrett Parker    johnparker@paulhastings.com,
deniselobodinski@paulhastings.com, lurlenemilner@paulhastings.com

Joseph E. White , III    jwhite@saxenawhite.com, e-file@saxenawhite.com,
msaxena@saxenawhite.com

Kim E. Miller    kim.miller@ksfcounsel.com

Lewis Kahn    lewis.kahn@ksfcounsel.com

Maya Saxena    msaxena@saxenawhite.com

William K. Whitner    kwhitner@paulhastings.com,
susanwilliams@paulhastings.com

<u>/s/ David A. Bain</u>
David A. Bain
Georgia Bar No. 032449
LAW OFFICES OF DAVID A. BAIN, LLC
1050 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
(404) 724-9990
(404) 724-9986 (facsimile)
dbain@bain-law.com