

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE HOMEBANC CORPORATION )
SECURITIES LITIGATION            )
_____)

CIVIL ACTION FILE
NO. 1:08-cv-1461-TCB

# O R D E R

This matter is before the Court on Defendants' motion to dismiss the consolidated amended class action complaint [125] and Defendants' request for judicial notice[1] in support of their motion to dismiss [126].

---

[1] In Defendants' request for judicial notice, they ask the Court to take judicial notice pursuant to Fed. R. Evid. 201 of various public documents filed with the Securities Exchange Commission ("SEC"), as well as the existence of the nationwide financial crisis that has negatively impacted the home mortgage industry.

In their reply brief, Defendants explain that their request for judicial notice is relatively narrow. With respect to the SEC documents, Defendants seek to rely upon these materials not for the truth of the statements, but instead for the limited purpose of showing that the statements were made. Plaintiff has no objection to this request. Accordingly, for this limited purpose, the Court will take judicial notice of the statements made in the SEC documents. Indeed, this approach is consistent with Eleventh Circuit precedent. *Accord Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (holding that when considering a motion to dismiss in a securities fraud case, a court may take judicial notice (for the purpose of determining what statements the documents contain) of relevant public documents filed with the SEC).

As for the nationwide financial crisis, Defendants clarify in their reply brief that they ask the Court to take notice of the existence of the financial crisis, not that the crisis caused the decline in HomeBanc's stock price. Plaintiff does not object to this limited request. Accordingly, the Court will also grant Defendants' request to take judicial notice of the existence of the financial crisis.

## I.    Facts[2]

### A.    Overview

This is a putative securities fraud class action.  The lead Plaintiff, William Kornfeld, Jr., brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class of purchasers of HomeBanc's common and Series A preferred stock purchased from September 26, 2005 through August 3, 2007 ("the class period").

Plaintiff alleges that Defendants Patrick S. Flood and Kevin D. Race, who were officers of HomeBanc during the class period, violated federal securities laws by issuing materially false and misleading statements and omitting material facts, ultimately causing HomeBanc's shareholders to suffer millions of dollars in losses.

### B.    The Parties

As noted, the lead Plaintiff is William Kornfeld, Jr.  He contends that he purchased the publicly traded securities of HomeBanc at artificially inflated prices during the class period and suffered damages when the stock price fell after the "true facts" were revealed.

---

[2] On a motion to dismiss, the Court accepts as true the factual allegations set out in the plaintiff's complaint. *See Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002).

Defendant Flood was HomeBanc's chief executive officer and chairman of the board at all relevant times. He resigned from the company on January 12, 2007.

Defendant Race served as HomeBanc's chief executive officer following Flood's resignation, and was president, chief operating officer and chief financial officer at all other relevant times.

### C.    Non-Party HomeBanc

At all relevant times, non-party HomeBanc was a Delaware corporation operating as a real estate investment trust (or "REIT") in the business of investing in and originating residential mortgage loans. HomeBanc was based in Atlanta, Georgia, and through its subsidiaries was engaged in the mortgage banking business primarily in the southeastern United States.

HomeBanc focused on originating prime one-to-four family purchase money mortgage loans. HomeBanc offered various fixed and adjustable rate residential mortgage loan products. The company also originated Fannie Mae/Freddie Mac mortgage loans, U.S. Department of Housing and Urban Development and Veterans Administration government-insured mortgage loans, and adjustable rate mortgage loans, which included

construction-to-permanent and second-lien mortgage loans, nonconforming loans, and subprime mortgage loans. Additionally, HomeBanc sold mortgage loans that it originated to unrelated third parties. The company offered its products through a retail network of stores and strategic marketing alliances.

The loans that HomeBanc originated were funded with money the company borrowed through a variety of credit facilities, including warehouse lines of credit and repurchase agreements—complex financing transactions whereby the company sold loans that it agreed to later repurchase. The company's credit facilities were collateralized by the company's own loans, and the quality of those loans was critical to the maintenance of the company's lines of credit. HomeBanc also used repurchase agreements to finance investment securities. These repurchase agreements were collateralized by mortgage-backed securities, and the terms of the agreements generally allowed HomeBanc to borrow up to a maximum of 95 percent of the market value of the securities.

Plaintiff contends that HomeBanc styled itself as a prime mortgage lender, which created an impression to the public that it made loans to the most credit-worthy borrowers who were eligible for the lowest monthly

4

rate, known as the prime rate. Prime borrowers are usually able to fully document such elements of their financial conditions as income, employment history and assets. Loans to prime borrowers are generally "conforming" loans, meaning that they meet certain funding and credit guidelines established by Fannie Mae and Freddie Mac, and do not exceed a dollar limit set by the Office of Federal Housing Enterprise Oversight ("OFHEO"). Being a prime lender of conforming loans is thus an indicator both of the quality of the company's loan portfolio and the existence of a ready secondary market for those loans.

### D.  Plaintiff's Core Allegations

Plaintiff alleges that during the class period, Defendants portrayed an overly rosy picture of the financial condition of HomeBanc to the public even though they knew that the company had massive problems as early as 2005. In particular, Plaintiff alleges that Defendants made materially false and misleading statements and omitted material facts regarding, inter alia, HomeBanc's (1) underwriting standards, (2) loan loss reserve model,[3] (3) purchase of mortgage-backed securities, (4) pace and quality of loan originations, (5) supposed focus on purchase money mortgages, (6) risk

---

[3] Although Plaintiff's complaint also discusses a separate category of reserves known as "contingent reserves," Plaintiff now concedes that this was an error, and he has since withdrawn any allegations to the extent that they reference the contingent reserves.

management practices, (7) internal and disclosure controls, (8) ability to meet to meet liquidity requirements, and (9) overall financial condition. The complaint also alleges that HomeBanc loosened its underwriting standards and policies in response to slowing loan originations and shifted from its stated focus on conservative risk management to attempting to profit by selling poor quality loans.

In an effort to support these allegations, the complaint cites a plethora of allegedly misleading statements made in HomeBanc's quarterly and yearly financial reports and other public documents, which include the following:

- HomeBanc's 2004 10-K:

  - HomeBanc's "business model emphasizes retail prime residential mortgage loan originations," "is built on a foundation of people dedicated to delivering the right products," and HomeBanc strives to create "a culture based on ethics."

  - "Our industry, including other mortgage REITs, Internet-based lending companies and finance and mortgage companies, is extremely competitive, due to relatively low entry barriers, the ability of competitors to offer lower interest rates and fees, or operate with less stringent underwriting standards to attract customers, and the ability of many lenders to participate in our industry on an opportunistic basis. We believe that our reputation, our focus on high-quality prime residential mortgage loans, our

customer service and strategic marketing alliances with realtors and home builders, and our experience with credit evaluation and risk-based pricing, will, over time, provide us with significant advantages over many of our competitors."

o "In each case, we apply our loan underwriting guidelines and practices and other quality control measures," "we have retained prime, adjustable-rate mortgage loans that meet our investment criteria," and HomeBanc uses "credit scores of borrowers" "in determining whether to make a loan."

o HomeBanc "maintains a reserve for losses that may arise in connection with the representations and warranties the Company provides to the buyers of its mortgage loans," and that "[s]uch reserves are estimated based on historical losses adjusted for current trends and information."

- HomeBanc's Third Quarter 2005 10-Q:

o "According to the Mortgage Bankers Association projections as of October 26, 2005, total mortgage originations are expected to remain virtually unchanged during 2005 compared with 2004 with a forecasted 15% increase in purchase money mortgage originations being completely offset by a forecasted decline in refinancing originations. These projections include the impact of home equity and sub-prime lending, which have experienced substantial growth and are products in which the Company does not participate to a significant degree. We believe ourselves to be relatively well-positioned to take advantage of these market conditions due to our focus on the purchase money portion of the market, and, therefore, expect to realize growth in originations of 15% in 2005 when compared with 2004."

- o "We believe that the fact that the growth in our loan originations continues to outpace growth in the overall market was largely due to continued success in developing our strategic marketing alliances and maintaining our focus on the purchase money mortgage market, which has historically exhibited more stability than the refinance market. Similarly, loan application volume of $2.0 billion during the third quarter of 2005 exceeded the $1.6 billion in volume during the third quarter of 2004."

- o "We presently believe our current cash balances, funds available under our financing arrangements (as described below) and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months. Our investments and assets also generate liquidity on an ongoing basis through mortgage principal and interest payments, prepayments and net earnings. Should our liquidity needs exceed these ongoing or immediate sources of liquidity, we believe that our mortgage loan portfolio could be sold to raise additional cash, subject to limitations on such sales needed to preserve our REIT status."

- HomeBanc's March 2006 Earnings Call:

  - o "We believe that historically now for the last year and a half and going forward that we have an excellent opportunity to connect with investors and deliver on expectations. We hope to be able to enlighten a little bit today about why we think we can continue to perform favorably in challenging markets. I think the key point here is that the performance of the portfolio throughout the year and continued into the fourth quarter very consistent in terms of how we decided to

fund to reduce risk returns and as well the credit profile, very comfortable finish in the year, that we accomplished I think that we have set out. Origination volume for the year effectively up 14% against the flat marketplace. So, as you marry those ideas, you get this origination, asset, margin consistency and credit consistency and that leads to—linked to this structure what we think is going to be a nice investment return."

o "I want to say again, just remind you what we thought day one and what we still believe today, the key for success, we think about this investment model, consistency in loan origination, consistency in the assets that you create, whether you are selling them or holding it for investment in terms of return and then finally consistency from a credit performance standpoint. We feel like in all three of those areas, we have had—have today a focus and we think links and connects very well to the investment community. And again, we are satisfied with the results for the fourth quarter."

o "On the investment front, maintaining of our selective idea about what we have put into the portfolio in terms of kind of assets, adjustable rate mortgage, and the credit quality that's aligned to it so that we can continue to feel comfortable in terms of the credit performance spent."

o "From a returns standpoint, things are stabilizing now and moderating growth on dividend, kind of getting to a reasonable rate based on where we've been, of course, in the last six quarters. We still think at the current rate we're offering a significant opportunity to investors and with that stabilization and moderation, of course, and the efficiencies that have been discussed, improving GAAP earnings and narrowing the GAAP tax difference, it's just part of our evolution now."

- o "We are comfortable that there is good opportunity for shareholders to see this as a good time for the investments to stay in place and potentially to add to it."

- HomeBanc's 2005 10-K:

  - o "Our business model emphasizes retail prime residential mortgage loan originations and is built on a foundation of people dedicated to delivering the right products and consistently high levels of customer satisfaction," . . . In each case, we apply our loan underwriting guidelines and practices and other quality control measures to seek better returns and consistency through our organization process."

  - o "We believe that our focus on people development and our customer-oriented process, coupled with our product offering and our emphasis on purchase money mortgage loans, distinguish our company and drive our profitability."

  - o "We believe that our reputation, our focus on high-quality prime residential mortgage loans, our customer service and SMAs with realtors and home builders, and our experience with credit evaluation, will, over time, provide us with significant advantages over many of our competitors."

  - o "We presently believe our current cash balances, funds available under our financing arrangements and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months."

- HomeBanc's 2006 First Quarter 10-Q:

  o "We believe that our loan originations continue to outpace industry trends as a result of our continued success in developing our SMAs and maintaining our focus on the purchase money mortgage market . . . ."

  o "We presently do not believe that we have significant interest rate risk on our loans held for sale under most of the interest rate scenarios we believe likely to occur."

  o "We presently believe our current cash balances, funds available under our financing arrangements (described below) and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months."

- HomeBanc's August 2006 Earnings Call:

  o "We still believe the retail business here at HomeBanc, the fundamentals are very solid. We think the platform that has been put in place certainly is a premium in the industry. We have seen companies get valued like that in the last year and we are hopeful we will continue to be valued at a premium. On the credit front, we just simply believe that we need to maintain a disciplined approach and not respond to the extreme conditions by making decisions today that could linger for '07 and '08."

  o "[W]e still think [our portfolio] is in good shape across all fronts . . . . We are going to be able really bring the full model to fruition and we are going to be excited to see that take place. I am sure you will be too."

- HomeBanc's Second Quarter 2006 10-Q:

  o "We believe that our loan originations continue to outpace industry trends as a result of our continued success in developing our SMAs and maintaining our focus on the purchase money mortgage market, which has historically exhibited more stability than the refinance market."

  o "We presently believe our current cash balances, funds available under our financing arrangements (as described below) and cash flows from operations including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months."

- HomeBanc's Third Quarter 2006 10-Q:

  o "We believe that our loan originations continue to outpace industry trends as a result of our continued success in developing our SMAs and maintaining our focus on the purchase money mortgage market . . . ."

  o "We presently do not believe that we have significant interest rate risk on our loans held for sale under most of the interest rate scenarios we believe likely to occur."

  o "We presently believe our current cash balances, funds available under our financing arrangements . . . and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months."

- HomeBanc's January 2007 Earnings Call:

  o "The bottom line is that we sit at this period of time with what we believe is an estimated fair value that's

well in excess of where the stock is certainly being valued today, where it's in excess of the stated book value of the balance sheet. And we think that is one of the strengths of the picture here, that in the current environment, with the—the part of the cycle that we're in is getting unfortunately missed. But we believe that if you look at those numbers specifically, our total book value of—at the end of September was $4.72 per common share."

o "I want to just remind everyone that we have a lot to work with here and a lot to build on at HomeBanc. We've got a—notwithstanding the current environment, we've got a high-quality franchise that's built over a number of years. It has a track record of growth, and we're committed to return it to profitability in terms of our origination franchise. We have a $6 billion investment portfolio that I talked about earlier that has $4.5 billion of assets that were self-originated, has a history of stability in terms of margin performance, and it will provide an earnings foundation as we rebuild and going forward into later in '07 and into '08. Third, we have a balance sheet that, we believe, has significant value. It's not reflected certainly, in where the stock is trading, but in the balance sheet itself that I've alluded to, and that we have that strength of the balance sheet to build on in terms of its valuation. And as we return performance, we believe we'll be recognized."

- HomeBanc's February 2007 Earnings Call:

  o "On a positive front at HomeBanc, although we faced some challenges and I'll talk about those, we have avoided some of the more systemic issues, which in many cases to be honest are very difficult to recover from. We've steered clear of the credit side as we were very disciplined on staying in the prime area and

avoided the auction ARM product altogether. We have had no issue with the early default on question that's come back to haunt many in the industry and our liquidity plan by design—and I'll talk a little bit more about that later—has served us well . . . . So, although the bottom line is not what I would like it to be this year, I do believe that we have taken the steps we can, controlled to position the Company for our recovery and we've given our best approach to using the resources we have to provide effectively we're on the way to do that.  And lastly, it's important to note that many of the decisions that we made in the past around credit, around staying away from the option ARM product, around our portfolio management discipline, our ability to provide liquidity contingency which we have acted upon, they provided us with the ability to fight another day notwithstanding the environment and I am grateful for that . . . I fully expect that a lot of the fruits of our work will really provide the results that shareholders really deserve beginning in the 2008 time frame."

- HomeBanc's 2006 Annual Report:

  o "We believe that our focus on people development and our customer-oriented process, coupled with our product offerings and our emphasis on purchase money mortgage loans, distinguish our company and drive our profitability."

  o "We believe that our reputation, our focus on high-quality  prime residential mortgage loans, our customer service and SMAs with realtors and home builders, and our experience with credit evaluation, will, over time, provide us with significant advantages over many of our competitors."

○ "We presently believe our current cash balances, funds available under our financing arrangements (as described below) and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months and beyond."

- HomeBanc's 2007 First Quarter 10-Q:

○ "We believe that our loan originations continue to outpace industry trends and as a result of our continued success in developing our SMAs and maintaining our focus on the purchase money mortgage market, which has historically exhibited more stability than the refinance market."

○ "We presently do not believe that we have significant interest rate risk on our loans held for sale under most of the interest rate scenarios we believe likely to occur."

○ "We presently believe our current cash flow balances, funds available under our financing arrangements (as described below) and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans and the net proceeds from the sale of our MBS, will be sufficient to support our liquidity requirements for the foreseeable future."

According to Plaintiff, the above statements were either false or misleading when made because HomeBanc (1) was not complying with its own credit evaluation and risk policies, (2) failed to disclose that it began purchasing mortgage-backed securities in 2005 to compensate for slowing loan originations, (3) loosened its underwriting standards as loan

originations slowed, (4) failed to disclose that originations of prime adjustable-rate mortgage loans had decreased, (5) implemented a loan loss reserve model that was inadequate, (6) was suffering from default rates that were "out of control," (7) faced liquidity problems, (8) locked in loans at a loss that had to be disposed of as "scratch and dent," and (9) had internal control problems.

Plaintiff avers that "the truth" began to emerge in HomeBanc's May 2007 10-Q. In the May 2007 10-Q, in addition to repeating many of the allegedly prior materially false and misleading statements, HomeBanc reported negative financial results in a number of areas:

- a consolidated net loss attributable to holders of common stock of $23.8 million, or $.42 per diluted share, for the quarter;

- investment portfolio assets comprised of mortgage loans held for investment and securities held to maturity and available for sale of $4.5 billion at quarter-end, a decrease from $5.9 billion for the same period of 2006;

- mortgage origination volume of $1.1 billion for the quarter, a decrease of 13% from $1.2 billion for the same period of 2006; and

- net interest income after provision for loan losses of $5.6 million for the quarter, a more than 80% decrease from $28.8 million for the same period of 2006.

HomeBanc's stock plummeted on this news. The price of HomeBanc's common stock fell 16.8 percent in two days from $2.08 on May 9, 2007 to $1.73 on May 11, 2007, and continued to decline in the days following the announcement. Similarly, the price of HomeBanc's preferred stock dropped 18.4 percent from $20.90 on May 9, 2007 to a closing price of $17.05 on May 11, 2007, and continued to decline in the days following the announcement. By mid-July, HomeBanc's common stock fell to under $1.00, and HomeBanc's Series A preferred stock was trading at approximately $14.

On August 6, 2007, HomeBanc filed a Form 8-K with the SEC that revealed that the New York Stock Exchange notified HomeBanc (on August 3, 2007) that it had suspended the listing of the Company's common stock and Series A preferred stock effective immediately in light of the low trading price of HomeBanc's common stock, which closed at $.30 on Friday, August 3, 2007.

On August 7, 2007, HomeBanc announced that it was unable to borrow any additional amounts under its credit facilities to satisfy its mortgage loan funding obligations and, on August 9, 2007, HomeBanc filed

a voluntary petition for relief under Chapter 11 of the U.S. Bankrupcty Code in the Bankruptcy Court for the District of Delaware.

After consolidation occurred with another related action, on August 5, 2009, Plaintiff filed a consolidated amended complaint against Defendants. The consolidated complaint asserts two claims: (1) a claim against Defendants for violations of the Securities and Exchange Act of 1934 ("the Exchange Act") and Rule 10B-5 promulgated thereunder; and (2) a controlling person claim pursuant to section 20(a) of the Exchange Act.

### E.   **Confidential Witnesses**

In an attempt to buttress the allegations that are made, throughout the complaint Plaintiff relies upon the statements and observations of twelve confidential witnesses. According to Plaintiff, these confidential witnesses are all former employees of HomeBanc.

Citing several cases that point out the dangers in relying upon confidential witnesses, Defendants argue that any allegations that are based upon statements made by such witnesses should be discounted. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed

'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (because confidential sources afford no basis for drawing the plausible competing inferences, courts should discount allegations from confidential sources).

Plaintiff counters that the confidential witnesses' allegations should be given weight and should not be discounted simply because the names of the witnesses have been withheld.

The Eleventh Circuit addressed this issue in *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008). There, the court held that "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." 544 F.3d at 1240.

Here, Plaintiff has given an adequate foundation for each of the confidential witnesses: he has identified the positions held by each of the witnesses, the time periods in which they were employed, and the basis for their knowledge.    Therefore, the Court will not wholly disregard the statements and observations that they make in the complaint and upon which Plaintiff relies.

However, the Court does observe a key problem with Plaintiff's heavy reliance upon these confidential witnesses.    Plaintiff has largely failed to plead any facts demonstrating that either Defendant supported or endorsed the confidential witnesses' assessments of HomeBanc.

For example, as support for its heading, "Defendants knew and/or were severely reckless in disregarding that HomeBanc had massive and systematic problems at least as early as 2005," Plaintiff alleges that "CW8" stated that "by the end of 2006 and the beginning of 2007 defaults were completely out of control.'"

But Plaintiff fails to supply any facts demonstrating that Defendants also believed defaults to be "out of control," nor does he plead any factual metrics establishing that "fact" to be the case.    Such allegations therefore add little to Plaintiff's contentions of fraud.    *Accord Tripp v. IndyMac*

*Bancorp, Inc.*, 2007 U.S. Dist. LEXIS 95445, at *9 (C.D. Cal. Nov. 29, 2007) (allegations relating to confidential witnesses do not support scienter if they do not plead facts showing that the defendants shared the beliefs and opinions of the confidential witnesses); *Fidel v. Rampell*, No. 02-61258, 2005 U.S. Dist. LEXIS 45321, at *13 (S.D. Fla. Mar. 29, 2005) ("At best, Plaintiffs' allegations are simply the opinions and accusations by confidential witnesses who believed that Dreilinger was mismanaging Miramar"); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) (allegations of confidential witnesses insufficient to support an inference or scienter where allegations "amounted to no more [than] former employees who [ ] disagreed with management's decisions").

Accordingly, although the Court will not disregard the allegations of the confidential witnesses, the Court finds that the import of their statements is severely diluted in light of Plaintiff's failure to plead sufficient facts to demonstrate that Defendants shared or endorsed their views.

## II.   **Discussion**

### A.   **Legal Standards**

#### 1.   **Motion to Dismiss**

In order for a complaint to survive a motion to dismiss, it "must include '[f]actual allegations [adequate] to raise a right to relief above the speculative level,'" with "'enough heft' to set forth 'a plausible entitlement to relief.'" *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (quoting *Bryant*, 187 F.3d at 1273 n.1). "Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law." *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1162 (S.D. Fla. 2004) (citing *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)). Moreover, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 554. A court may consider publicly filed documents on a motion to dismiss. *Garfield*, 466 F.3d at 1260 n.2.

## 2.  **Section 10(b) Claim**

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder make it unlawful for any individual to employ a manipulative or deceptive device in connection with the purchase or sale of any security. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

To state a claim of securities fraud under these provisions, a plaintiff must allege six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." *Mizzaro*, 544 F.3d at 1237.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") heightens the pleading requirements in securities class actions. *See* 15 U.S.C. § 78 u-4(b)(1)(B). First, the PSLRA requires that a securities fraud class action complaint:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-(b)(1)(B).

Second, the PSLRA raises the standard for pleading scienter. It states that a plaintiff asserting a securities fraud claim "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite state of mind for a Section 10(b) claim is an intent to deceive, manipulate, or defraud, or a showing of severe recklessness. *Mizzaro*, 544 F.3d at 1238. Therefore, in a securities fraud class action, a plaintiff can no longer plead the requisite scienter element generally as he could previously do under Fed. R. Civ. P. 9(b). *Id.* Moreover, the complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004).

As the Eleventh Circuit summarized these standards in *Mizzaro*, "to survive a motion to dismiss . . . [the plaintiff] must (in addition to pleading all of the other elements of a § 10(b) claim) plead 'with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." 544 F.3d at 1238.

24

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court further clarified the exacting pleading requirements under the PSLRA. The Court explained that a "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. As the Court explained:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences. . . ." Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

*Id.* at 310.

### 3.    **Section 20(a) Claim**

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall . . . be liable jointly and severally liable with and to the same extent as such controlled person."  15 U.S.C. § 78t(a).  This statute

"imposes derivative liability on persons that control primary violators of the Act." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008).

In order to state a claim under Section 20(a) based on a violation of Section 10(b), a plaintiff must allege that: (1) a primary liability under Section 10(b) exists; (2) the defendants had the "power to control the general business affairs" of the corporation; and (3) the defendants had the requisite power to "control or influence the specific corporate policy which resulted in primary liability." *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001).

Because a primary violation of the securities laws is an essential element of a section 20(a) derivative claim, a plaintiff adequately pleads a section 20(a) claim only if the primary violation is adequately pleaded. *Id.* Thus, both parties agree that the pivotal issue in this action is whether Plaintiff adequately pleaded a violation of section 10(b) and Rule 10b-5.

## B.    Analysis

Defendants attack the complaint on three grounds, contending that (1) the misrepresentations or omissions alleged therein fail to satisfy the materiality standard; (2) it fails to allege facts that create a strong inference

of scienter; and (3) it fails to allege facts to establish the required loss causation. The failure to establish any one of these elements is a sufficient ground to dismiss the complaint. *In re Witness Sys., Inc. v. Sec. Litig.*, No. 1:06-cv-1894, 2008 U.S. Dist. LEXIS 109173, at *21-22 (N.D. Ga. Mar. 31, 2008).

## 1. **Materiality**

A misstatement or omission will be considered material only if its disclosure would alter the total mix of information available to the reasonable investor and if there is a substantial likelihood that a reasonable investor would consider it important to an investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *In re World Access, Inc. Sec. Litig.*, 310 F. Supp. 2d 1281, 1290 (N.D. Ga. 2004). "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *In re S1 Corp. v. Sec. Litig.*, 173 F. Supp. 2d 1334, 1350 (N.D. Ga. 2001).

Additionally, the PSLRA contains a safe harbor for certain forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1). Pursuant to that safe harbor, a defendant may avoid liability for forward-looking statements that may prove to be false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999). "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *See Amalgamated Bank v. Coca-Cola*, No. 1:05-cv-1225-RWS, 2006 U.S. Dist. LEXIS 73909, at *15 (N.D. Ga. Sept. 29, 2006) (citations omitted).

After careful review of the complaint, the Court agrees with Defendants' position that the bulk of the statements upon which Plaintiff relies fail to satisfy the above standards for materiality.

First, as Defendants point out, none of the alleged misstatements caused a spike in either HomeBanc's stock price or the stock's trading volume. Indeed, all of the statements were followed the next day by an

opening stock price that was *lower* than the prior day's closing price. This decline reinforced a trend of HomeBanc's falling stock price throughout the class period as the mortgage industry struggled as a whole. Indeed, as the chart that HomeBanc included in its brief illustrates, HomeBanc's common stock price dropped from $7.76 to $.30 during the class period, generally decreasing with each successive announcement that Plaintiff alleges was false and misleading.

Although Defendants have not cited any cases holding that to be actionable the alleged false statements must cause an increase in the issuer's stock price, logic would suggest that such a factor is relevant in the Court's materiality analysis. The Court therefore finds that, though not dispositive, the absence of any increase in HomeBanc's stock price following the purportedly false statements undercuts the inference that the alleged misstatements were material.

Second, throughout the complaint, Plaintiff makes conclusory allegations of falsity without establishing contrary true facts. To show falsity, one typically juxtaposes an alleged misrepresentation to a contrary true fact. Here, the complaint is replete with alleged statements and

omissions that are not contradicted by what Plaintiff contends to be the "true facts."

For example, one of Plaintiff's main contentions throughout the complaint is that Defendants concealed the purchase of mortgage-backed securities, i.e., that Defendants failed to disclose that HomeBanc began purchasing mortgage-backed securities in 2005 to compensate for slowing originations of the company's high-quality prime residential mortgage loans.

Yet HomeBanc expressly stated in its 2004 Form 10-K, "although we do not presently intend to actively invest in loans or mortgage-backed securities collateralized by assets that we do not originate, we may do so from time to time in the future." HomeBanc also specifically revealed that "in the fourth quarter of 2005 we also began to invest in residential mortgage-backed securities to increase our net interest income." Such facts illustrate that many of the alleged false statements were not false when made. Moreover, it bears noting that regardless of whether HomeBanc disclosed the purchase of mortgage-backed securities, not doing so does not make false or misleading HomeBanc's statement that its *focus* was on high-quality prime residential loans.

Third, the complaint is also rife with forward-looking statements made by HomeBanc that were accompanied by meaningful risk disclosures. Indeed, many of HomeBanc's public filings during the class period were replete with targeted risk disclosures highlighting HomeBanc's market vulnerabilities and emphasizing many of the concerns that came to pass.

For example, Plaintiff alleges that HomeBanc failed to disclose that a substantial decrease in loan originations "was affecting the Company's viability" and misled investors when it stated in various disclosures throughout the class period that

> We presently believe our current cash balances, funds available under our financing arrangements (as described below) and cash flows from operations, including proceeds from sales of fixed-rate and adjustable-rate mortgage loans, will be sufficient for our liquidity requirements for the next 12 months.

Yet, HomeBanc warned in those same disclosures that

- We currently have no commitments for any financings other than through our current facilities, and we cannot ensure that we will be able to access the capital markets or obtain any additional financing at the times required and on terms and conditions acceptable to us, if at all. If we fail to obtain needed additional financing, our growth would be slowed or suspended.

- A prolonged economic slowdown, or declining real estate values, could reduce our growth and profitability . . . .

31

- Our ability to meet our long-term liquidity requirements is subject to the renewal of credit and repurchase facilities and/or obtaining other sources of financing, including additional debt or equity from time to time . . . .

Plaintiff also alleges that HomeBanc failed to comply with its own credit evaluation and risk policies and misled investors when it stated that

> We believe that our reputation, our focus on high-quality prime residential loans, our customer service and SMAs with realtors and home builders, and our experience with credit evaluation, will, over time, provide us with significant advantages over many of our competitors.

Yet HomeBanc also cautioned that

> We have a limited operating history with respect to securitizing mortgage loans or managing a portfolio of mortgages, which may affect our ability to complete securitizations on favorable terms . . . . Our management has limited experience in operating Real Estate Investment Trusts . . . .We may be unable to effectively mitigate the risk of changes in interest rates, which could adversely affect our earnings and cash available for distribution to our shareholders . . . . We [also] have limited experience servicing mortgage loans . . . .

Plaintiff further alleges that Defendants violated their own underwriting standards, failed to disclose that loan originations were decreasing, and misled investors when HomeBanc stated

> We believe that our loan originations continue to outpace industry trends as a result of our continued success in developing our SMAs and maintaining our focus on the purchase money mortgage market . . . .

However, HomeBanc also warned

- The forward-looking statements may not be realized due to a variety of factors, including, without limitation: . . . the risks of changes in interest rates on our mortgage loan production, the types of loans we originate and hold or sell, and our interest sensitive assets and liabilities; interest rate risks and credit risks of customers; loan loss experience and the rate of loan charge-offs; risks inherent in originating and holding mortgage loans, including the risks of principal repayment and fluctuations in collateral values . . . .

- The decline in our mortgage origination volume could be larger than the decline forecasted for the mortgage origination industry generally, which would adversely affect our business, financial condition, results of operations and the price of our securities . . . .

These are but a few examples of the disclosures that Defendants made throughout the class period. Indeed, Defendants issued a multitude of other cautionary statements, which are detailed in Exhibit C to Defendants' reply brief. These included other statements such as

- Our performance during the quarter reflects . . . the effects of a number of extremely challenging market conditions including a seventeenth consecutive Fed rate increase, industry overcapacity, aggressive pricing and credit practices, and of particular importance to HomeBanc, unusual and unfavorable real estate conditions in Florida. We currently expect that these market conditions will prevail throughout 2006.

- The Company's third quarter results reflect the continuation of adverse market conditions in the mortgage industry,

33

specifically in relation to loan originations. As a result of current conditions, and our expectation that these conditions will continue into 2007, we accelerated and intensified our expense reduction initiatives during the quarter.

- Although our previously disclosed restructuring activities are on track to meet our projected results, the impact of the sub-prime mortgage market meltdown has overflowed into the prime mortgage market. In particular, gain on sale margins during the quarter were significantly lower than forecasted, and we are revising our guidance.

- The disruption of the sub-prime market has had an effect on all segments of the mortgage market, as is reflected in our significantly deteriorated gain on sale margins during the first quarter [of 2007].

- We have a limited operating history . . . our management has limited experience in operating REITS.

- We expect to continue to have consolidated GAAP net losses in the near future.

- We leverage our portfolio, which exacerbates any losses we incur on our assets.

- We have limited experience in making provisions for loan losses, and our allowance for loan losses may be inadequate to cover potential future losses in our mortgage loan portfolio.

- Our recent operating results may not be indicative of our future operating results, due to several key factors. Our growth has benefited from recent low interest rates and a long period of economic and population growth in our markets. Due to stable generally decreasing interest rates over recent years, our historical performance may not be

indicative of results in a rising interest rate environment. In addition, our recent and rapid growth may distort some of our ratios and financial statistics. In addition, our business strategy of developing a portfolio of mortgage loans that we service and that is financed with leverage, including mortgage-backed securities, affect the comparability of our results, cash flows and financial condition against prior periods. Since early 2004 we have been retaining rather than selling a material portion of the loans we originate. We also have incurred and will continue to incur additional costs as a public company. In light of this growth and changes in our business, our historical performance and operating and origination data may not be predictive of our future performance.

- We believe that the risks associated with our business will be more acute during periods of economic slowdown or recession, especially if these periods are accompanied by high interest rates and/or declining real estate values and home purchases. Declining real estate values likely will reduce our level of new mortgage loan originations, since borrowers often use increases in the value of their existing home to support the refinancing of their existing mortgage loans or the purchase of new homes at higher prices and/or levels of borrowings. Declining real estate values also increase the likelihood that we will incur losses on loans that we are holding in the event of a default by the borrower. Any sustained period of increased payment delinquencies, foreclosures, or losses could adversely affect both our net income from loans in our portfolio as well as our ability to originate, sell, finance, and securitize mortgage loans, which would significantly harm the value of our mortgage loans, our results of operations, financial condition, business prospects, the price of our common stock and our ability to make distributions to our shareholders.

- It is important to note that the description of our business, in general, and our mortgage-backed securities financings, in

particular, is a statement about our operations as of a specific point in time. It is not meant to be construed as an investment policy, and the types of assets we hold, the amount of leverage we use, the liabilities we incur and other characteristics of our assets and liabilities are subject to reevaluation and change without notice.

- We are exposed to credit risk from the time we fund mortgage loans until they are either sold or the principal balance is repaid in full. While we have not experienced any significant credit losses to date, in the event of a significant rising interest rate environment and/or economic downturn, mortgage loan defaults may increase and results in credit losses that would adversely affect our liquidity and operating results. This risk will be magnified as we build our portfolio of adjustable-rate mortgage loans whose rates increase as the base rate increases, subject to contractual limits.

- Certain of the mortgage products that we offer may expose us to greater credit risks, including the risks of delinquencies and/or credit losses, which may negatively affect our results of operations. A substantial portion of the mortgage loans that we originated in 2005 and the first six months of 2006 are ARMs or hybrid ARMs. In 2005 and the first six months of 2006, these products comprised substantially all of the mortgage loans held in our investment portfolio. In addition, we may, from time to time introduce additional variable rate mortgage loans products to address changes in market conditions and customer demand.

- 2007 will be a difficult year for our industry. We will hope to see some action by the Fed later in the year but the reality is they're probably on hold for the near term. Housing will begin a period of time of transition so we're expecting 2007 to be difficult. However, having said that, it doesn't mean we can't make progress and our goal is to focus on those areas of our business and of our structure that we've talked about that we can control notwithstanding the environment.

- If we do not generate sufficient liquidity, we will be unable to conduct our operations as planned. We cannot assure you that any of our sources of liquidity will continue to be available to us or that we will be able to negotiate and obtain future sources of liquidity on favorable terms or that we will be able to employ our liquidity effectively.

- The market conditions in the first quarter of 2007 have severely affected our gain on sale income and our net interest margin, and these market conditions may not improve in the foreseeable future. During the first quarter of 2007, market conditions in the mortgage loan industry continued to deteriorate. As a result of these market conditions, we experienced a sharp decline in our gain on sale income from the sale of our mortgage loans that we originated, and a decline in the net interest income that we realized from our investment portfolio. There is no assurance that these market conditions will improve, or that we will be able to meaningfully adapt to these market conditions, and our net income (loss) may continue to suffer as a result.

Plaintiff acknowledges the existence of these cautionary statements, but argues that none of them was specific enough. It is true that boilerplate cautionary statements may be insufficient to invoke the protections of the statutory safe harbor. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 850-51 (11th Cir. 2004). However, in order for a defendant to avail itself of the safe harbor, the cautionary statement need only mention important factors that could cause the company's actual results to differ materially from those in the forward-looking statement, and "it does not

37

require a listing of *all* factors." *Harris*, 182 F.3d at 807; *see also Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1232 (M.D. Fla. 2002) ("[A] cautionary statement does not have to list all factors that might cause actual results to differ from those in the forward-looking statements, and does not necessarily have to identify the specific factor that led to different results").

At bottom, the gravamen of the complaint is that HomeBanc's public statements expressed an overly optimistic view of the future. However, as Exhibit C illustrates, throughout the class period HomeBanc warned of a challenging credit market, disclaimed guarantees that it was immune to market conditions, and warned about the uncertainty and risks endemic to its industry. Although these disclosures may not immunize every statement that Plaintiff alleges to be false or misleading, they do as a whole erode the essential allegations of Plaintiff's complaint. *Accord In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d at 1351.[4]

---

[4] Moreover, to the extent any of the statements made by Defendants relating to HomeBanc's hopes for continued prosperity are not forward-looking, they may qualify as general statements of corporate optimism, rendering them not actionable under the PSLRA. *Accord Amalgamated Bank*, 2006 U.S. Dist. LEXIS 73909, at *11.

### 2. __Scienter__

Next, even assuming that some or all of the alleged misstatements meet the materiality standard, Defendants argue that Plaintiff has failed to allege sufficient facts establishing the requisite scienter.

As detailed previously, a plaintiff faces a stringent pleading standard with respect to scienter. A securities fraud plaintiff must plead scienter with particular facts "that give rise to a strong inference that the defendant acted in a severely reckless manner." *Garfield*, 466 F.3d at 1264. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Garfield*, 466 F.3d at 1264; *see also McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989). Moreover, according to the Supreme Court in *Tellabs*, the inference of scienter must be more than merely plausible or reasonable; it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent. *Tellabs*, 551 U.S. at 310.

The Court has carefully reviewed the entirety of Plaintiff's complaint in light of the heightened pleading standards that apply in connection with the scienter requirement. Having done so, the Court finds that Plaintiff has failed to allege sufficient facts to demonstrate a cogent and compelling inference of scienter. Plaintiff has alleged no facts that would establish that Defendants' conduct rose to the level of recklessness or an intent to defraud. The complaint cites difference of opinion, conjecture and innuendo in an attempt to make Defendants' behavior look suspicious, but it conspicuously omits any facts that would require one to rule out an innocent explanation for the alleged behavior. *See Bryant*, 100 F. Supp. 2d at 1376 ("if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter then that plaintiff's facts cannot be fairly said to raise a strong inference that the defendant acted with the required state of mind"), *rev'd on other grounds*, 252 F.3d 1161 (11th Cir. 2001).

In particular, unlike the typical securities fraud case, there are no allegations (1) concerning a financial restatement (which HomeBanc's auditors would likely have demanded had they shared Plaintiff's view that the company's loan loss reserves were inadequate); (2) of auditor

resignations; (2) that the company violated accounting standards or "cooked its books"; (3) that suspiciously-timed inside stock sales occurred; (4) that a corrective disclosure was made; (5) concerning what motive Defendants had to defraud the public; or (6) that HomeBanc's actual loan reserves (as opposed to the model) were inadequate or were a contributing factor to, much less the cause of, HomeBanc's demise.

As Plaintiff points out, it is true that not all of these facts have to be present in order for a securities fraud plaintiff to establish scienter. Nevertheless, the complete absence of any such facts compels the conclusion that scienter is lacking. *Accord Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1291 (S.D. Fla. 2008) (finding the complaint fell short of the stringent test for pleading scienter where there were no allegations "concerning financial restatements, auditor resignations, or other 'red flags' that should have alerted the [defendants] to the fraud"); *Druskin*, 299 F. Supp. 2d at 1323 (holding that there was a significant lack of indicia of fraud where there were no restatements or auditor resignations).

Indeed, the Eleventh Circuit has expressly noted that any inference of scienter is particularly weak where, as here, the complaint fails to allege

41

inside stock sales intended to take advantage of the company's purportedly inflated stock prices. *Mizzaro*, 544 F.3d at 1253 ("the amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter"); *see also Druskin*, 299 F. Supp. 2d at 1322 (holding there was a significant lack of indicia of fraud where there was no suspicious or unusual trading of stock); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 668 (D. Colo. 2007) (noting that some courts have found that "[t]he absence of inside sales dulls allegations of fraudulent motive"); *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (failure to plead that the defendants sold stock at an inflated price negated an inference of scienter); *In re K-tel Int'l, Inc. v. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("evidence that the individual defendants abstained from trading may undercut allegations of motive"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders"); *In re Ceridian Corp. Sec. Litig.*, 504 F. Supp. 2d 603, 618 (D. Minn. 2007) ("the fact that [defendant] did not sell *any* stock during the class period substantially

undermines any inference of scienter"); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d at 1297 (finding it untenable that the defendants were motivated to commit fraud when they did not sell their stock).

Here, Defendants retained their stock even as the price of HomeBanc's stock collapsed during the class period. It is counterintuitive to think that one would fraudulently inflate a stock price without a concomitant intent to sell the stock at an artificially high price. Typical securities fraud complaints detail how and by how much the corporate officers profited by timing purchases and sales of company stock to take advantage of fraud. The fact that Defendants did not take advantage of the purportedly inflated price to sell their holdings overwhelms the inference that they were knowingly withholding from the public damaging and material information about HomeBanc.

Plaintiff responds to this point by alleging in conclusory fashion that Defendants' motive was to simply maintain the stock price. However, such a conclusory allegation regarding scienter is insufficient in light of the heightened pleading standards that apply here. *Accord In re Witness Sys. Inc., Sec. Litig,* No. 1:06-cv-1894, 2008 U.S. Dist. LEXIS 109174, at *28 (N.D. Ga. Mar. 31, 2008) ("general allegations of a motive to maintain stock

price or enhance a Company's business prospects cannot support a strong inference of scienter"); *Malin v. IVAX Corp.*, 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998) (referring to motives of maintaining stock price and company's cash flow, the court explained that because "such motives can be ascribed to virtually all corporate officers and directors, they fail to raise a strong inference of knowing or reckless conduct"); *Druskin*, 299 F. Supp. 2d at 1338 (general allegations of motive, such as maintaining company stock price or meeting analyst estimates do not support a strong inference of scienter).

Plaintiff's complaint is deficient in another important way. As has already been detailed, the complaint relies principally upon the allegation that Defendants disseminated materially false and misleading statements regarding the general financial condition and future prospects of HomeBanc. Among other things, Plaintiff points to statements made by Defendants regarding the fact that HomeBanc was "relatively well positioned to take advantage of certain market conditions," that Defendants were "pleased" with HomeBanc's performance and believed that it would "continue to perform favorably in challenging markets," that HomeBanc's "focus on people development" and its "customer-oriented process coupled

with its product offerings and its emphasis on purchase money mortgage loans distinguished the company and drove its profitability," and that Defendants believed that HomeBanc could support its liquidity requirements in the future.

Plaintiff's reliance upon after-the-fact events (i.e., HomeBanc's ultimate demise) to support an inference that these and other earlier statements must have been intentionally misleading and made with scienter amounts to little more than fraud by hindsight, which is not actionable. *In re Serologicals Sec. Litig.*, 1:00-cv-1025, 2003 U.S. Dist. LEXIS 27465, at *34 (N.D. Ga. Feb. 20, 2003) ("Seizing on figures later used in financial statements exemplifies pleading fraud by hindsight, an impermissible method of pleading fraud); *see also City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight' . . . . Thus, allegations that defendant should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997)).

When viewed holistically, the strongest inference to be drawn from Plaintiff's amended complaint is not that Defendants acted with intent to mislead investors, but rather that like so many other in the mortgage industry, "Defendants were simply unable to shield themselves as effectively as they anticipated from the drastic change in the housing and mortgage markets . . . ." *Tripp*, 2007 U.S. Dist. LEXIS 95445, at *10-11.

In sum, at most the complaint tells a narrative of Defendants' unsound business strategy; it does not allege facts sufficient to support a cogent and compelling inference of fraud.

### 3.  **Loss Causation**

Finally, even if the statements were material and scienter could be established, Defendants argue that Plaintiff has failed to allege sufficient facts to establish loss causation.

Under the PSLRA, a plaintiff has the burden of proving that the act or omission of the defendant proximately caused his injury.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 340 (2005).  Loss causation refers to the link between the defendant's misconduct and the plaintiff's economic loss.  *In re Netbank, Inc. Sec. Litig.*, No. 1:07-cv-2298-BBM, 2009 WL 2432359, at *13 (N.D. Ga. Jan. 29, 2009).  In essence, this element requires

a plaintiff to allege that the share price of the security "fell significantly
after the truth became known." *Dura*, 544 U.S. at 347. Loss causation
requires a plaintiff to show that "the untruth was in some reasonably direct,
or proximate, way responsible for his loss." *In re Coca-Cola Enters., Inc.
Sec. Litig.*, 510 F. Supp. 2d 1187, 1203 (N.D. Ga. Feb. 7, 2007). The
complaint therefore must allege facts sufficient to demonstrate that the
defendant's actions were a "significant contributing cause" to the plaintiff's
loss. *Id.* However, unlike a pleading of materiality or scienter, the pleading
standard for loss causation in a securities fraud case does not impose "any
special requirement" on the plaintiff. *Dura*, 544 U.S. at 346.

Here, the complaint alleges that the price of HomeBanc shares was
artificially inflated and that Defendants' material misstatements and
omissions during the class period directly and proximately caused
economic loss to Plaintiff when the truth about HomeBanc was revealed.

At its core, Plaintiff's position is that it is sufficient to allege that the
putative class paid artificially inflated prices for their stock and that
HomeBanc's collapse alone revealed the "truth" so that HomeBanc's public
statements during the class period must have been false. However, such
conclusory allegations do nothing more than allege the elements of loss

causation as opposed to alleging facts that if true would establish those elements. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *accord Lewis v. Brautigam*, 227 F.2d 124, 127 (5th Cir. 1955).

Importantly, the complaint's allegations never explain how or even allege that any of the claimed adverse information that was revealed, which is described in the complaint as the "truth," actually revealed the falsity of any alleged prior statement or omission, subsequently causing a drop in stock price. Indeed, notwithstanding Plaintiff's conclusory heading in the consolidated amended complaint that the truth finally begins to emerge with HomeBanc's release of its May 2007 10-Q, the 10-Q did not state that HomeBanc's earlier statements issued during the class period were materially inaccurate, would need to be restated, or were in any way tainted by misconduct.

Plaintiff's speculative and conclusory assertion that the drop in HomeBanc's stock must have been caused by fraudulent conduct is belied by the fact that HomeBanc's stock price declined steadily throughout the entirety of the class period, as did the stock of HomeBanc's competitors. Although the Court is mindful that issues of causation are typically not susceptible to resolution at the motion to dismiss stage, the complaint here

48

fails to make any allegations that would allow the Court to distinguish between any losses caused by Defendants' alleged misrepresentations and the collapse of the mortgage industry as a whole.

As the court in *Lentell* observed, "[w]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which if proven would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). Such is the case here.

Accordingly, the Court finds that Plaintiff has failed to plead sufficient facts of loss causation to withstand dismissal.

## III.  **Conclusion**

Because the Court has concluded that the complaint fails to adequately allege a primary violation under section 10(b) of the Exchange Act, Plaintiff's claim for controlling person liability under section 20(a) of the Exchange Act necessarily fails. The Court therefore finds that Plaintiff's complaint should be dismissed with prejudice.[5]

---

[5] Plaintiff has not sought leave to amend his complaint in the event that the Court granted Defendants' motion to dismiss. Nevertheless, the Court is mindful that a plaintiff is

49

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss [125] and GRANTS Defendants' request for judicial notice [126]. The CLERK is DIRECTED to close this case.

IT IS SO ORDERED this 13th day of April, 2010.

Timothy C. Batten, Sr.
United States District Judge

---

often given a chance to file an amended complaint to cure any deficiencies in an original complaint. However, the Court will not grant leave here because Plaintiff has had multiple occasions to file a viable complaint. Indeed, the plaintiffs in the two lawsuits consolidated in this action and the additional related lawsuit filed in this Court that was voluntarily dismissed without prejudice on February 21, 2008 have now attempted to plead their claims four times. Under such circumstances, leave to amend will not be permitted. *Accord In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 153-54 (3d Cir. 2004) (trial court did not abuse its discretion by failing to grant investors leave to amend Section 10(b) claim following dismissal of consolidated amended complaint for failure to state a claim, where investors as a group already had filed six initial complaints and had been given time to assemble a consolidated complaint).